EXXON MOBIL CORPORATION,
Appellant,

v.

Louise ALTIMORE, Appellee.

No. 14–04–01133–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

April 3, 2008.

416

Reagan W. Simpson, J.D. Brashline, Aditi Dravid, Glenna M. Kyle, Bryant Robert Bremer, Amy C. Eikel, Houston, Gary D. Elliston, Dallas, for appellant.

Daryl L. Moore, Denmon Heard, Troy Damon Chandler, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justice SEYMORE and Senior Justice MURPHY.*

* Senior Justice Paul C. Murphy sitting by as-

## OPINION

CHARLES SEYMORE, Justice.

This is a personal injury case wherein appellant, Exxon Mobil Corporation ("Exxon") seeks reversal of a judgment for exemplary damages.

After a thorough review of the appellate record, consistent with the standard of review described below, we find the evidence legally insufficient to support a judgment for exemplary damages. Accordingly, we reverse and render judgment that appellee take nothing.

### I. PROCEDURAL HISTORY

Appellee's deceased husband was employed at Exxon's Baytown refinery from 1942 until he retired in 1977. He was a machinist until 1972, when he was promoted to a supervisory position and worked in an air-conditioned tool room at the polyolefins unit. Appellee sued Exxon and sixtynine other defendants alleging, inter alia, negligence and gross negligence in connection with injuries claimed as a result of exposure to asbestos dust brought home on her husband's clothes. Before trial, appellee settled or dismissed her claims against all defendants except Exxon. Following presentation of the evidence and arguments of counsel, the jury awarded actual damages totaling $992,001. The jury also assessed the same amount in exemplary damages. After allocating settlement credits, the trial court rendered judgment based solely on the jury's assessment of exemplary damages. Exxon's post-trial motions for new trial, remittitur and to modify the judgment were overruled by operation of law. On appeal, Exxon raises the following issues: (1) Exxon does not owe appellee a legal duty, (2) appellee did not present legally or factually sufficient evidence to support a jury

signment.

finding of proximate cause, (3) appellee did not present legally or factually sufficient evidence to support exemplary damages, (4) exemplary damages against Exxon are unconstitutional, (5) the trial court reversibly erred by submitting a negligent activity jury question, (6) the trial court reversibly erred by admitting evidence of rulings by a different court that pertained to an unrelated case, (7) the trial court reversibly erred by denying Exxon's request for a mistrial after appellee's counsel informed the jury that the testimony of Exxon's expert was rejected by a jury in another case, (8) the trial court erred by limiting allocation of settlement credits to compensatory damages.

A three-member panel of this court previously concluded that Exxon did not breach a cognizable legal duty because the risk of harm to appellee was not foreseeable. In a subsequent opinion that involved asbestos exposure with a similar fact pattern, our sister court in Dallas reached the same conclusion. *Alcoa Inc. v. Behringer*, 235 S.W.3d 456, 458 (Tex. App.-Dallas 2007, pet. filed). However, the Texas Supreme Court has not, heretofore, determined whether an employer has a legal duty (owed to the spouse of an employee) to warn or prevent the employee from transporting toxic dust to premises occupied by the spouse.

Because our focus is on legal sufficiency of the evidence to support imposition of exemplary damages, we do not address the questions of legal duty and proximate cause. In the interest of judicial economy, we will assume without deciding, that Exxon breached a legal duty owed to appellee and appellee sustained damages proximately caused by that breach. *See* TEX. R. APP. P. 47.1.

## II. Standard Of Review

■ Exxon contends due process requires application of the "some care" standard of review because the relevant period of time for appellee's exposure to asbestos was 1942 through 1977. We disagree. In *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 918–19 (Tex.1981), the supreme court eliminated the "some care" defense in connection with suits for punitive damages against employers. The court distinguished statutory employer gross negligence cases from other third party liability cases that involve assessment of punitive damages. *Id.* at 919–20. Subsequently, in considering conduct amounting to gross negligence outside the employer-liability generis of cases, the supreme court refused to apply the "some care" defense. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 923–24 (Tex.1998). Accordingly, we reject Exxon's "some care" defense.

■ We acknowledge that circumstantial evidence will support a judgment for malice. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex.2001). However, our review of the evidence pertaining to exemplary damages "requires an examination of the events and circumstances from the viewpoint of the defendant *at the time the events occurred, without viewing the matter in hindsight.*" *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994) (emphasis added); *KPH Consolidation, Inc. v. Romero*, 102 S.W.3d 135, 144 (Tex.App.-Houston [14th Dist.] 2003), *aff'd*, 166 S.W.3d 212 (Tex.2005). In determining legal sufficiency under the clear and convincing standard, we review all of the evidence in a light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex.2004). When applying the test, we must assume the factfin-

der resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). Yet, undisputed facts contradicting the verdict need not be disregarded. *Id.* After considering all of the evidence in the manner described, if the reviewing court decides that no reasonable jury could form the requisite belief or conviction, it may then hold the evidence legally insufficient. *Id.*

## III. ANALYSIS

In submitting the jury charge, the trial court adhered to the statutory requirements for imposition of punitive damages in cases accruing on or after September, 1995, and filed before September 1, 2003, with the following definitions in question number three:

Do you find by clear and convincing evidence that the injury to Louise Altimore resulted from malice attributable to Exxon Mobil Corporation?

Clear and convincing evidence means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegation sought to be established.

Malice means an act or omission by Exxon Mobil Corporation,

A. which, when viewed objectively from the standpoint of Exxon Mobil Corporation, at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

B. of which Exxon Mobil Corporation had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

■ Accordingly, in reviewing this record for legal sufficiency of the evidence, we will be guided by the two-pronged test for imposition of exemplary damages. Objectively, the defendant's conduct must involve an "extreme degree of risk," which is measured by the magnitude and probability of the anticipated injury. *Moriel,* 879 S.W.2d at 23. Subjectively, the defendant must have actual awareness of the extreme risk created by its conduct. *Id.* The extreme risk component of gross negligence is the distinguishing feature between conduct deserving of punishment and conduct which merely requires restitution. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993). Our supreme court explained this rationale in *Moriel:*

In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior.... If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger. In such a case, punitive damages are not appropriate.

879 S.W.2d at 23.

■ It is important to distinguish between the general negligence concept of risk that family members of refinery employees will contract a disease and an *extreme* degree of risk that family members of refinery employees will sustain serious injury or death. The "extreme degree of risk" standard is a significantly higher than the "reasonable person" test for ordinary negligence. *Moriel,* 879 S.W.2d at 22. To determine if acts or omissions involve extreme risk, we must analyze the events and circumstances from the defendant's perspective at the time the harm occurred without resorting to hindsight.

*Id.* at 23. The concept of *extreme* risk requires more than a remote possibility of injury or a high probability of minor harm, but instead requires proof that serious injury to appellee was likely. *Universal Servs. Co. v. Ung,* 904 S.W.2d 638, 641 (Tex.1995).

It is undisputed that appellee contracted mesothelioma. Exxon's epidemiologist, Gary Raabe, testified that asbestos exposure is the only known cause of mesothelioma.[1] However, consistent with our standard of review, we cannot disregard undisputed evidence that appellee was exposed to asbestos other than what might have been in dust particles carried home from Exxon's refinery. Further, we acknowledge there is no evidence in this record from which the jury could determine whether asbestos from the refinery or asbestos particles in appellee's house were a direct cause of appellee's mesothelioma.

Here, we are careful not to conflate proof of causation or reliability of scientific evidence with legal sufficiency of the evidence to support the jury's conclusion that Exxon exposed appellee to an extreme degree of risk of harm. However, we acknowledge that the majority of appellee's evidence regarding potential harm from exposure to asbestos is derived from forensic medical reports and epidemiological studies. Accordingly, our legal sufficiency analysis is based, in part, on the amount and quality of forensic evidence published or available during the relevant period of time, that will support the two-pronged test for imposition of exemplary damages. **Viewed objectively, was there clear and convincing evidence that Exxon subjected appellee to an extreme risk of harm?**

### 1. Appellee's contentions

■ In support of her claim that she was subjected to an extreme degree of risk of harm, appellee contends: (1) The risks associated with asbestos exposure have been well known since the 1930's; (2) By 1935, scientists discovered cancer in textile factory workers; (3) In 1935 the Public Health Service issued multiple announcements regarding the danger associated with exposure to asbestos; (4) By 1937, Exxon's internal documents reveal its awareness of the harm that could come to workers exposed to asbestos through visible and invisible dust; (5) During the early 1940's, Exxon knew that exposure to asbestos could cause death; (6) During the latter part of the 1940's, Exxon employees authored confidential memoranda acknowledging asbestos exposure could cause lung cancer; (7) By 1955, Exxon's expert recognized a relationship between lung cancer and asbestos; (8) In 1958, the Texas legislature enacted laws to protect employees from exposure to asbestos; (9) By 1963, an epidemiological study of miners and others who lived near a crocidolite mine in South Africa revealed a relationship between exposure to asbestos and mesothelioma; (10) In 1964, Exxon's Medical Research Division reported that "families of asbestos

---

1. Asbestosis and mesothelioma are two separate diseases, each caused by exposure to asbestos. Asbestosis is a non-cancerous scarring of the lung tissue caused by the inhalation of asbestos fibers. As more asbestos fibers are inhaled, the scarring of the lungs increases and breathing capacity decreases. If the scarring is severe enough, the disease may prove fatal. Mesothelioma is a rare and almost universally fatal form of cancer where tumors develop in the serosal lining of the body cavities with pleural mesothelioma being the most common. With pleural mesothelioma the tumors develop not in the lungs, but in the pleura lining the lungs. The tumors then spread in a diffuse manner into the surrounding areas of the body. Death usually occurs within nine to twelve months of diagnosis.

workers were getting sick as the result of brushing the fibers off their clothing."

### 2. Asbestos at Baytown Refinery

Appellee's husband, Mike Altimore, was employed at the Exxon Baytown refinery from 1942 until 1977. Most of his tenure was spent as a machinist. Exxon avers that Mr. Altimore transferred to the polyolefins unit at the chemical plant in 1959. The record is unclear relative to the exact date; however, we estimate that he transferred to the polyolefins unit in the early 1960's. He was promoted to a supervisory position and assigned to an air-conditioned tool room at the polyolefins unit in 1972. After this promotion, Mr. Altimore did not work in dusty conditions. Mr. Altimore remained in that position until he retired in 1977.[2] Accordingly, the relevant period of time for this court to analyze Exxon's conduct relative to appellee begins in 1942 and ends in 1972.

It is undisputed that Baytown refinery employees used asbestos for pipe insulation, gaskets, fire brick, cement and packing materials. Mr. Altimore's fellow employees, Roosevelt Boullion and Roy Calma, testified that he was exposed to dust while working around insulated pipes. As machinists, they used hammers to knock insulation from pumps, turbines, centrifuges, motors and flanges. From time to time, they worked below other employees who were either removing or replacing insulation. Calma stated that he and Mr. Altimore regularly went home with visible dust on their clothes. Jesse Stovall was Mr. Altimore's supervisor. He acknowledged that machinists would create dust clouds when they removed insulation from equipment. He also testified that dust from insulation settled on workers' clothes. Appellee's expert, Dr. Richard Lemen, testified regarding the danger to refinery workers exposed to asbestos.[3] He opined that Mr. Altimore was exposed to toxic levels of asbestos because the dust was visible in the work atmosphere. However, we cannot disregard Stovall's testimony that the polyolefins unit generates "food grade" white dust and Dr. Lemen's admission regarding the absence of data sufficient to accurately measure Mr. Altimore's cumulative asbestos exposure. Further, in determining whether the risk of injury was extreme, we cannot disregard Dr. Lemen's admission that any attempt to calculate the degree of exposure would be sheer speculation.

### 3. Scientists' Knowledge of the Risk to Refinery Workers

A significant portion of the scientific evidence was based on work environment studies. Consequently, we review the evidence to determine whether members of the scientific community had knowledge that there was a risk of harm to *refinery workers* during the relevant time period.[4]

By the time this case was tried, researchers could not identify a level of as-

---

2. Mr. Altimore died in 1992. There is no evidence that his death was caused by mesothelioma.

3. Dr. Lemen earned his post-graduate degrees in epidemiology. Most of his career has been dedicated to the study and prevention of occupationally-related diseases and injuries. He was employed by the United States Public Health Service ("USPHS") from 1970 until he retired in 1996. He was promoted to the rank of rear admiral in the USPHS. He also

served as Assistant Surgeon General and Deputy Director of the National Institute For Occupational Safety and Health ("NIOSH").

4. We acknowledge that, during all times material to our inquiry, the majority, if not all, of the scientific community, postulated that the risk of harm, relative to asbestos exposure, differed based on whether a person was exposed to asbestos through mining, manufacturing or as an end user of asbestos products.

bestos exposure below which there is no risk for developing cancer. Dr. Gary Raabe, Exxon's epidemiologist, testified that asbestos exposure was the only verifiable cause of mesothelioma. Moreover, representatives of the Occupational Safety and Health Administration ("OSHA") had admitted they were not aware of a toxic substance that had been more clearly demonstrated to have a detrimental health effect on humans than asbestos. However, the record indicates that research was gradual, and knowledge regarding the risks associated with asbestos exposure increased over a lengthy period of time.

Dr. Lemen provided a detailed history regarding progress within the scientific community in discovering potential danger and evaluating the risks of injury associated with exposure to asbestos. It was his opinion that by 1942, there had been significant advances in asbestos research. He referred to epidemiological studies confirming the hypothesis that asbestos exposure could cause disease, specifically asbestosis.[5] By 1942, the United States Public Health Service ("USPHS") was involved in asbestos research.[6] Scientists in Great Britain and the United States were engaged in studies linking lung cancer to asbestos exposure.[7] The USPHS alerted the public to the fact that prolonged exposure to asbestos dust caused pulmonary fibrosis, and recommended safety precautions. Such recommendations included controlling levels of dust that contain toxic substances, and limiting exposure to a Threshold Limit Value ("TLV") of five million particles per cubic foot, a specific level considered to be safe.

In 1946, the American Council of Governmental Industrial Hygienists adopted the five million particles per cubic foot standard, which was reported in a 1938 publication by the USPHS. The Fleisher–Drinker study of asbestos insulation workers in United States Navy shipyards was also published in 1946. This was the first major study that involved workers *using* asbestos products as opposed to workers in asbestos mines or asbestos product manufacturing plants. Researchers concluded that asbestos insulation workers were not subjected to dangerous levels of asbestos and the five million particles per cubic foot standard appeared to be a safe level of exposure.

In 1955, British researcher, Dr. Richard Doll, published an epidemiological study in which he concluded that there was a causal relationship between asbestos exposure and lung cancer. In 1957, a Texas state

5. E.R.A. Merewether & C.W. Price, Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry (London, H.M. Stationary Office 1930). Merewether and Price studied asbestos textile workers in Great Britain. They concluded that asbestos exposure caused asbestosis. They also considered workers other than in the manufacturing areas and concluded that asbestos exposure at the same levels would be a hazard to those workers using asbestos products. Merewether and Price concluded that workers should be given a "sane appreciation of the risk." They opined that workers who understand the risks associated with asbestos will take necessary precautions to protect themselves.

6. United States Public Health Service, Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers (1935). In addition, Dr. Dreessen of the USPHS conducted a study of asbestos textile workers along the eastern coast of the United States and published his study in 1938. Based on these studies, he provided an estimated level of exposure that would not be injurious.

7. S. Roodhouse Gloyne, *Two Cases of Squamous Carcinoma of the Lung Occurring in Asbestosis,* Tubercle 5, 5–10 (1935). Dr. Gloyne reported two persons with non-fatal asbestosis who developed carcinoma of the lung. Dr. Gloyne's study focused on workers in the asbestos textile manufacturing industry.

occupational health agency promulgated a regulation limiting asbestos exposure to five million particles per cubic foot for all industries operating in Texas which was subsequently adopted by the legislature. Act of June 19, 1965, 59th Leg., R.S. ch. 687, 1965 Tex. Gen. Laws 1583, 83, *repealed by* Act of June 18, 1967, 60 th Leg., R.S. ch. 727, § 17, 1967 Tex. Gen. Laws 1941, 52 (current version at Tex. Occ.Code Ann. §§ 1954.001–.403 (Vernon 2004)).

In 1964, the first epidemiological study that pertained to asbestos products end users was prepared by Drs. I.J. Selikoff, E.C. Hammond, and J. Churg, entitled: "The Occurrence of Asbestosis Among Insulation Workers in the United States." They reported an increased incidence of lung cancer and mesothelioma, and concluded that there is a causal relationship between these diseases and asbestos exposure. In addition, they reported cancer among carpenters, steam fitters, and other building trade workers indirectly exposed to asbestos insulation. Also in 1964, Dr. William Marr, a shipyard doctor, published a study of insulators in the *Industrial Hygiene Journal.* Dr. Marr reported the insulators were not exposed at levels above the TLV of five million particles per cubic foot, yet workers were still contracting asbestos-related diseases. According to Dr. Lemen, the significance of Dr. Marr's study was that the TLV may not be protective of workers.

In 1965, Dr. Selikoff, Dr. Hammond, and Dr. Churg published a study in which they concluded that mesothelioma was a disease caused by asbestos in multiple work environments. The authors questioned whether the TLV of five million particles per cubic foot was protective of workers because more than ten percent of the work-

ers died as a result of asbestos-related disease. Because of lingering doubt about the relationship between asbestos exposure and lung disease, Dr. Selikoff and other experts urged researchers to conduct more epidemiological studies.

According to Dr. Lemen, 1972 was a crucial year in the history of asbestos research. By 1972, experts agreed that a certain degree of exposure to asbestos could cause asbestosis or cancer. After this postulate was generally accepted, the debate focused on what constituted a safe level of exposure for workers. In June of 1972, OSHA released its initial asbestos exposure standard: five fibers per cubic centimeter over an eight hour time-weighted average. This was the first asbestos exposure standard to cover all industries on a nationwide basis. Under these new regulations, workers were prohibited from taking their work clothes home to be laundered if they had been exposed to asbestos. Also in 1972, while it had insufficient information to issue a single standard protective of all asbestos-related disease, the National Institute for Occupational Safety and Health ("NIOSH") proposed an asbestos exposure standard of two fibers per cubic centimeter.[8] Therefore, during the relevant time period, 1942 to 1972, there was a consensus within the scientific community that there was a measurably safe level of exposure to asbestos.

### 4. Asbestos in appellee's home

Appellee testified that Mr. Altimore regularly came home from the plant with dust on his clothes. Appellee would shake the dust out of her husband's clothes before placing them in the washing machine. Dr. Lemen opined that Mr. Altimore brought toxic levels of asbestos home on his work

---

**8.** Both the OSHA and NIOSH standards were primarily designed to protect against asbesto-   sis.

clothes. Both Dr. Jay Segarra and Dr. Samuel Hammar opined that appellee was exposed to asbestos sufficient to cause mesothelioma.[9] However, in considering whether Exxon's conduct created an extreme degree of risk to appellee during the relevant period of time, we cannot disregard the fact that many manufacturers and end users were regularly handling and marketing asbestos products. Appellee's home was built with asbestos products in her ceiling tiles, attic insulation, siding, and fireplace grates. She also had contact with asbestos through application of household repair products.

### 5. Scientists' Knowledge of the Risk to Appellee

Appellee implicitly asks the court to conclude that purported awareness of an extreme risk to refinery employees equates with awareness of an extreme risk to their spouses.[10] After presenting a plethora of scientific studies regarding asbestos in the workplace, appellee refers this court to evidence that scientists reported family members of workers exposed to asbestos were getting sick. Dr. Lemen described Dr. J.C. Wagner's article entitled "Diffuse Pleural Mesothelioma and Asbestos Exposure in the Northwestern Cape Province," which was published in 1963 by the British Journal of Industrial Medicine. Dr. Wagner stated: "without a doubt mesothelioma is causally associated with asbestos." Dr. Lemen explained that Dr. Wagner "put together a series of cases that he had seen in his clinic in South Africa." All the workers mentioned in the article were miners of crocidolite, one of the fiber types of asbestos. Dr. Wagner concluded that the miners, and their family members who lived around the mines, were at risk for developing disease.

Appellee also refers to a summary of a case study reported by Exxon's Medical Research Division by Dr. R.E. Eckhardt. Dr. Eckhardt published a summary of the Conference on Biological Effects of Asbestos,[11] in which he reported that J.G. Thomson had written a paper entitled, "Asbestos and the Urban Dweller." Dr. Eckhardt noted the author "suggests that the families of asbestos workers may develop asbestosis as the result of brushing the fibers off their clothing[.]" Exxon's editor reached the following conclusion: "It would appear, therefore, that very minor exposures to asbestos may result in pulmonary changes but that these do not occur until long after the initial exposure, perhaps in the vicinity of 40 years."

Notwithstanding our conclusion regarding the relevant period of time to analyze legal sufficiency, appellee relies on an internal memorandum written in 1974 by Fred Venable, Exxon's industrial hygienist. In the memorandum, Venable reported the results of air samples collected from an area where employees were removing asbestos on October 8–9, 1974. Venable expressed concern about "the clothing contamination by asbestos dust which is almost unavoidable in this scope of removal operations." He stated, "Not only are we

---

9. Dr. Sam Hammar is a board certified pathologist. Dr. Jay Segarra is a pulmonologist.

10. The relevant anecdotal medical reports and epidemiological studies in this record do not support appellee's implicit contention that the risk of injury from exposure to asbestos brought home by her husband is the same degree of risk to employees working on premises at the Baytown refinery and chemical plants. During the relevant period of time, researchers focused on the risk of exposure to asbestos in different trades and work environments.

11. <<R. E. Eckhardt>>, <<Exxon Medical Research Division to Exxon Corp., Esso Research and Engineering Company Summary of the Conference of Biological Effects of Asbestos>> (1964).

violating the existing regulations concerning clothing by not providing such clothing and laundering it, but we are also failing to protect our employees and the families of our employees from asbestos exposure." By 1974, many scientists acknowledged that asbestos posed a risk outside the workplace. Venable noted that while Exxon had embarked upon an asbestos control program with "some degree of complacency regarding the health of our employees, there has been considerable change in thinking, at least on the part of this writer, because of the appearance of two cases of mesothelioma in recent months among Exxon Company employees."

At the conclusion of his direct testimony, Dr. Lemen opined that Exxon acted with "an extreme degree of risk and unconscious [sic] indifference to the rights and safety of Mr. Altimore[.]" First, we note that Exxon's counsel objected to the speculative nature of this portion of Dr. Lemen's testimony. Second, notwithstanding Exxon's misquotation on page 36 of its original brief, Dr. Lemen did not testify that Exxon acted with an extreme degree of risk toward *appellee*. Third, the assumptions on which the question was based are not supported by the evidence. Appellee's counsel asked Lemen to assume Exxon had knowledge that employees' families could be "put at risk." However, on cross-examination Lemen admitted that the medical evidence in the 1960's was conflicting. He also acknowledged that as late as 1972, scientist believed exposure below a certain dosage did not pose a danger.

Dr. Lemen could have based his opinion on the Venable memorandum and general knowledge that asbestos could cause lung cancer. However, the grounds for this assumption are not relevant to Exxon's knowledge of an extreme degree of risk for serious injury to appellee. As stated earlier, the Venable memorandum was not published until 1974, two years after Mr. Altimore began to work in an air-conditioned environment. Further, Exxon's general knowledge of a risk to employees is no evidence that Exxon had knowledge of an extreme degree of risk to family members of employees. Because the assumptions that underpin Dr. Lemen's testimony were contrary to the evidence, that testimony amounts to no evidence of malice. *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex.1995). We also conclude that Dr. Lemen's opinion was not based on well-founded scientific methodology, therefore it is unreliable and incompetent to support a judgment for exemplary damages. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex.1997).

We cannot disregard Dr. Hammar's testimony that asbestos and mesothelioma have a dose response relationship. The more asbestos that accumulates in the lungs, the higher the chances of getting an asbestos-related disease, such as mesothelioma. Moreover, in determining whether Exxon subjected appellee to an extreme degree of risk, we cannot disregard appellee's failure to produce any reliable scientific data to support her "sufficient exposure" theory.[12] Here, the jury did not

---

**12.** We have assumed Exxon breached a legal duty which caused appellee's injury. However, in consideration of the fact that appellee did not present evidence of "specific" causation, she would have formidable obstacles in proving causation. *See Frias v. Atlantic Richfield Co.*, 104 S.W.3d 925, 928–31 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see also*

*Borg–Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex.2007) (plaintiff contended he sustained injury because of exposure to asbestos, however, the court concluded that he failed to carry his burden of proof on causation because he did not present quantitative evidence of "dose" and evidence that the "dose" was a significant contributing factor to the cause of

have comparative epidemiological studies or expert testimony delineating the difference between a general danger versus an extreme risk to appellee.

### 6. Conclusion–Objective Prong

■ First, we reiterate that most of appellee's evidence regarding the risk of injury from asbestos exposure is derived from epidemiological studies of various work environments. Second, during the relevant period of time there was a consensus among scientists that there was a safe level of exposure to asbestos in the workplace. Third, appellee did not present a single medical report or epidemiological study (available during the relevant period of time) in which researchers concluded that family members of refinery employees were exposed to an *extreme* degree of risk. Fourth, considering the status of epidemiology during the relevant period of time, appellee failed to produce any evidence, either circumstantial or direct, that Mrs. Altimore was exposed to an *extreme* risk given the dosage or amount of asbestos fiber on her husband's clothes. Fifth, none of appellee's experts opined (with proper predicates) that Exxon exposed *her* to an extreme degree of risk of harm during the relevant period of time. Sixth, while there had been reported cases of mesothelioma among Exxon employees in 1974, the record contains no evidence that any family member of an Exxon Baytown refinery employee developed mesothelioma during the relevant period of time.[13] Seventh, because appellee's evidence is derived mainly from epidemiological studies,

we cannot disregard appellant's evidence regarding the lack of consensus within the scientific community, during the relevant period of time, that family members of refinery workers were subjected to *any* degree of risk. Eighth, even if this record contained some evidence of a risk to appellee, evidence of simple negligence is not evidence of gross negligence. *Lee Lewis Constr.*, 70 S.W.3d at 785.

After viewing all of the evidence in the light most favorable to the verdict, we cannot conclude that a reasonable trier of fact could form a firm belief or conviction, when viewed objectively from Exxon's standpoint, there was an *extreme* degree of risk of serious injury to appellee during the relevant period of time. Here, the magnitude of appellee's injury is disproportionate to the riskiness of Exxon's behavior. Even if Exxon's acts or omissions caused appellee's injury, when viewed prospectively and without benefit of hindsight, Exxon's conduct did not create an extreme degree of risk that appellee would sustain serious injury. *Moriel*, 879 S.W.2d at 23.

Because we conclude the evidence is legally insufficient to support the first prong of the test for a finding of malice, we sustain Exxon's third issue. *See Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 374 (Tex.2004). Accordingly, we reverse the trial court's award of exemplary damages and render judgment that appellee take nothing.

---

his disease). We acknowledge that appellee claims injury because of mesothelioma, not asbestosis. However, on this record, appellee would have similar hurdles because she relies on epidemiological studies to prove causation.

**13.** The Venable memorandum is not reliable evidence of an extreme degree of risk because the air samples that form the bases of Vena-

ble's opinions were not gathered during the relevant period of time. Moreover, given appellee's reliance on epidemiological studies, we expect that there would be at least one previous manifestation of mesothelioma in the spouse of a refinery worker before a jury could form a firm belief or conviction that appellee was subjected to an *extreme* risk.