Opinion by Justice Whitehill
Following Carl Rogers's death from mesothelioma, his wife Vicki Lynn Rogers and daughters Natalie Rogers and Courtney Dugat sued appellant, The Goodyear Tire & Rubber Company, Carl's long time employer. A jury found that asbestos fibers in the workplace were a proximate cause of Carl's mesothelioma and that his death resulted from Goodyear's gross negligence. The jury assessed exemplary damages against Goodyear. After the trial court applied the statutory cap, it awarded appellees a total of $2,890,000, plus postjudgment interest and court costs.
In three issues, Goodyear contends that (i) the evidence is legally insufficient to show gross negligence; (ii) the evidence of causation is legally insufficient because appellees failed to rule out radiation as a cause of mesothelioma ; and alternatively (iii) appellees' exemplary damages should be reduced as a result of their failure to prove the full amount of economic damages found by the jury.
We overrule Goodyear's first two issues, sustain its third issue, and suggest remittitur of part of the exemplary damages award.
I. BACKGROUND
A. Facts
Carl Rogers worked for Goodyear as a tire builder from 1974 to 2004 at a facility in Tyler, Texas. He operated a tire building machine in a room about the size of a football field. The room contained eighty-five tire building machines set up in a grid. Carl was exposed to asbestos at Goodyear, both from the tire building machines and from insulation on pipes running overhead. Carl was exposed to asbestos from the overhead insulation in two ways. Any time the insulation was removed to repair or *641 replace the pipes, a great deal of dust was released. Also, when Goodyear began asbestos abatement procedures, no steps were initially taken to enclose the dust and protect employees from it. The brake pads in the tire building machines also contained asbestos and released asbestos when they got worn down. Compressed air was used to clean brake dust out of the machines. This process created a cloud of dust, some of which was asbestos. Carl was exposed to asbestos when the brakes on his machine were replaced, when compressed air was used to fix a stuck brake valve, and when his machine was cleaned with compressed air. In addition, he experienced bystander exposure from being near other tire building machines. Neither the machines nor their instructions contained any warnings about asbestos. By the mid-1980s, Goodyear had replaced the tire building machines with machines that did not contain asbestos, and it had begun an abatement process to remove the asbestos insulation.
Carl was diagnosed with lung cancer in 1999. The cancer spread to his brain. Carl had surgery to remove the cancer from his lung and brain. He also had radiation therapy "through his head" and chemotherapy. The treatment was successful and Carl was cured. In 2008, he was diagnosed with mesothelioma. He died the following year at the age of sixty.
Appellees, Carl's wife and two adult daughters, sued Goodyear, alleging its gross negligence caused Carl's mesothelioma. Among other things, appellees alleged Goodyear failed to adequately warn Carl of the dangers of asbestos and failed to adhere to industry safety standards to protect workers from harm. Goodyear is a subscriber under the workers' compensation statute. Recovery of workers' compensation benefits is the exclusive remedy of an employee for a work related death, unless the death was caused by the employer's gross negligence. TEX. LAB. CODE § 408.001 ; see Mullins v. Martinez R.O.W., LLC , 498 S.W.3d 700, 704 (Tex. App.-Houston [1st Dist.] 2016, no pet.). When an employee's death is caused by his employer's gross negligence, the employee's surviving spouse and heirs may recover exemplary damages. LAB. § 408.001(b).
After appellees filed suit in Dallas County, the case was transferred to Harris County to the asbestos multidistrict litigation (MDL) court for pretrial proceedings and was transferred back to Dallas County for trial. See TEX. GOV'T CODE § 74.162. In the pretrial MDL court, appellees filed a motion for no-evidence summary judgment on Goodyear's "alternative causation theory." In the motion, appellees asserted Goodyear's experts were of the opinion that radiation Carl received in 1999 for a brain tumor was the sole cause of his mesothelioma. Appellees argued Goodyear had no evidence showing that the dose of radiation Carl received to his brain was a substantial factor in causing the mesothelioma. Goodyear filed a response in which it asserted the dose of radiation Carl received led to a doubling of his risk of developing mesothelioma. Goodyear attached affidavits and depositions from its experts, along with other evidence. Goodyear argued its evidence created a genuine issue of material fact regarding radiation as a cause of the mesothelioma. Appellees also moved to exclude the testimony of Goodyear's experts regarding radiation treatment to the brain as a cause of mesothelioma. Goodyear filed a motion to exclude the testimony of appellees' experts in part due to their failure to exclude radiation exposure as a cause of the mesothelioma. The MDL judge denied Goodyear's motion to exclude the testimony of appellees' experts. The judge granted appellees' no-evidence motion for summary judgment and granted their motion to exclude testimony *642 from defense experts about radiation as a cause of mesothelioma. In both of the orders that were granted, the MDL judge expressly found there was no scientifically valid epidemiology to create a causal relationship between therapeutic radiation for lung cancer and mesothelioma.
At trial, appellees' expert Dr. Edwin Holstein, whose specialty is occupational medicine, explained that asbestos is harmful if one inhales it. It can cause asbestosis, which is scarring of the lungs, lung cancer, and mesothelioma. Lung cancer and mesothelioma are different cancers. They are distinguishable because they start in different places. Mesothelioma starts in the lining around the lung. Holstein testified that lung cancer does not turn into mesothelioma. There is no cure for mesothelioma, and the average life expectancy after diagnosis is twelve to eighteen months.
Appellees' experts provided evidence of Carl's dose of exposure to asbestos. Holstein limited his estimate to a ten-year period, from roughly 1975 to 1985. Holstein relied on the report of Steve Hays, an industrial hygienist, to determine Carl's exposure from the insulation. Hays limited his analysis to exposure from ordinary maintenance of the insulated pipes and did not factor in exposure during the abatement process. Hays determined that Carl's asbestos exposure from the insulation was .426 fiber years per cc.[1] Holstein analyzed Carl's asbestos exposure from the brakes on his machine and on neighboring machines. To be conservative, Holstein considered Carl's bystander exposure for only brake replacements and for only two neighboring machines, when he could have been in the middle of as many as eight machines. Holstein relied on published studies about brakes releasing asbestos into the air. As a low level estimate of Carl's actual exposure from asbestos in the machines, Holstein came up with .187 fiber years per cc. Adding this amount to Carl's exposure from insulation, Holstein arrived at a total exposure of .613 fiber years per cc. Based on this level of exposure, Holstein testified that, according to several published studies, Carl's increased risk of mesothelioma was more than double. In fact, it ranged from four times that of the general population to almost twenty-two times that of the general population. Holstein determined that Carl's occupational exposure to asbestos while working as a tire builder in the Goodyear plant was a substantial factor in the development of his mesothelioma.
Hays also testified about Carl's approximate dose of asbestos exposure. Hays chose to analyze a nine-year period of exposure rather than ten. Hays estimated Carl's total dose of exposure at .516 fiber years per cc. Hays testified that Carl's exposure at Goodyear placed him at an increased risk for mesothelioma over the background population of between four and twenty-two.
Holstein provided a history of awareness of the risks of asbestos. As far back as the 1930s, there were publications about asbestos hazards. The first epidemiological study of people exposed to asbestos found that asbestos could be a hazard in the workplace and found deaths from asbestosis. The study specifically mentioned brakes as a potential asbestos hazard. It offered methods of prevention which are still valid today, including substitution, isolation, *643 and education about the hazard. Another publication from that time period warned that if a cloud of asbestos dust, or even a hazy look in the air from dust, was visible to the eye, the asbestos was almost certainly at a level hazardous to health and life. Also, in 1935, two doctors published the first case possibly linking asbestos to cancer, rather than just asbestosis. By the 1950s there were about seventy published cases of lung cancer in people working with asbestos. In 1955, a British scientist published an epidemiological study which, in Holstein's view, showed beyond a reasonable doubt that asbestos was a cause of lung cancer.
The first published report of a person exposed to asbestos getting mesothelioma came in 1943, with two others following in 1949 and 1951. Then in 1960, scientists found thirty-three cases of mesothelioma. These people all worked in or around asbestos mines. In 1964, Dr. Irving Selikoff arranged an international conference of scientists who had been researching the health effects of asbestos. Their results showed that asbestos was a very major hazard and that asbestos in a multitude of industries would cause disease, including mesothelioma.
According to Holstein, by 1972 there were multitudes of studies demonstrating that asbestos could kill and actually cause asbestosis and cancer. In June 1972, the Occupational Safety and Health Administration (OSHA) published standards for exposure to asbestos dust. The standards warned, "In view of the undisputed grave consequences from exposure to asbestos fibers, it is essential that the exposure be regulated now, on the basis of the best evidence available now, even though it may not be as good as scientifically desirable. An asbestos standard can be reevaluated in the light of the results of ongoing studies, and future studies, but cannot wait for them. Lives of employees are at stake." The OSHA document stated that "it appears that levels of exposure which may be safe with regard to asbestosis are not safe with regard to mesothelioma."
Holstein testified that the OSHA limits for asbestos exposure were initially designed primarily to protect people from asbestosis. OSHA lowered the level of exposure in 1976 and continued to lower it over the years. According to Holstein, Carl would have had multiple occasions during his career when he was exposed to levels of asbestos above the OSHA ceiling requirements.
In a July 1972 letter to its plant personnel managers, Goodyear attached the June 1972 OSHA standards and included its own instructions regarding asbestos. Each facility was instructed to "carefully survey their operations for their use of asbestos and asbestos-containing materials." The instructions noted that asbestos fiber inhalation has been implicated as a possible causative factor in a "form of cancer called a mesothelioma." Goodyear instructed that "[i]nitial routine air sampling shall be done weekly until sufficient data is obtained to assure complete coverage of all phases of the work. After the base data is complete, routine sampling shall be done monthly." (Emphasis in original.) Again in October of 1978, Goodyear warned its Tyler plant manager and others in writing about asbestos. The letter from Goodyear's manager of Corporate Safety and Industrial Hygiene Services stated, "All of our plants contain asbestos insulation of one kind or another somewhere in the facility, and it is very important that the procedures that were issued [previously] are being properly enforced and followed." The letter further noted there continues to be "a great deal of concern on the long-term effects of asbestos exposures even in the very low *644 levels of exposure." Plant managers were urged to review and follow the procedures.
Goodyear kept track of all chemical sampling in a "chemical hazard and toxicity" (CHAT) report. The CHAT report showed that the total number of asbestos samples taken at the Tyler plant was thirty-six. The first samples were taken in July 1978 after a complaint was made to OSHA about asbestos in storage. A contractor removed the insulation. The CHAT report showed that Goodyear monitored three of the contractors, not its employees, for asbestos. One contractor had an exposure of 3.05 fibers per cc. In 1980, Goodyear sampled materials. In 1983, Goodyear took six samples from maintenance electricians. Over half of the total samples were taken in 1985, after asbestos abatement efforts had begun.
Goodyear trained its employee Ray Jackson in industrial hygiene. Jackson, who testified for Goodyear, stated that between 1972 and 1976, he personally took samples for asbestos at the Tyler plant. There were two different types of samples, an area sample that examines particulate matter in an area and a personal sample that collects what a person breathes in. He testified he never had a sample that exceeded the OSHA limit. Although Jackson indicated he once had written documentation of his asbestos sampling, none was provided at trial. At his deposition a few weeks prior to trial, however, Jackson testified that the first time Goodyear performed any air monitoring for asbestos was in 1978 when OSHA responded to the complaint about the asbestos in storage.
According to Carl's coworker Martin Kennedy, workers at the Tyler plant first got information that there may be asbestos in the plant in 1983. That information concerned the insulation, not the tire machines. Signs warning about the hazards of asbestos were placed in the Tyler plant for the first time in 1984.
B. Trial
At the conclusion of a three-week trial, the jury found by clear and convincing evidence that asbestos fibers from the Goodyear Tyler facility were a proximate cause of Carl's mesothelioma that resulted in his death. The jury also found by clear and convincing evidence that Carl's death resulted from Goodyear's gross negligence.
For purposes of calculating the exemplary damages cap, the jury was asked to determine the amounts of money that would fairly and reasonably compensate each appellee for her damages from Carl's death. Specifically, the jury was asked to determine each appellee's past and future pecuniary loss, past and future loss of companionship and society, and past and future mental anguish. The jury also determined that $15 million should be assessed against Goodyear as exemplary damages and apportioned 90% of those damages to Vicki and 5% each to Natalie and Courtney. After it applied the statutory cap on punitive damages, the trial court awarded appellees a total of $2,890,000. Vicki was awarded $2,601,000, and Courtney and Natalie were each awarded $144,500.
II. ANALYSIS
A. Issue One: Is the gross negligence evidence legally insufficient?
In its first issue, Goodyear contends the evidence is legally insufficient to support the jury's gross negligence finding. Gross negligence consists of both objective and subjective elements. U-Haul Int'l, Inc. v. Waldrip , 380 S.W.3d 118, 137 (Tex. 2012). A plaintiff must prove by clear and convincing evidence that: (1) when viewed objectively from the defendant's standpoint at the time of the event, the act *645 or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. Id. ; see TEX. CIV. PRAC. & REM. CODE § 41.001(11). "Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. U-Haul , 380 S.W.3d at 137 ; see CIV. PRAC. & REM. § 41.001(2). In reviewing the legal sufficiency of a finding that was required to be proved by clear and convincing evidence, we view the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. See Sw. Bell Tel. Co. v. Garza , 164 S.W.3d 607, 627 (Tex. 2004).
1. Objective Component
Goodyear challenges the sufficiency of the evidence to prove both the objective and subjective elements of gross negligence. It first contends appellees failed to prove an extreme degree of risk. Under the objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. U-Haul , 380 S.W.3d at 137. Goodyear acknowledges mesothelioma is a serious injury, but asserts appellees did not prove the likelihood of that injury.
Although Goodyear presented its own estimates of the dose of Carl's asbestos exposure and its experts concluded there was no extreme degree of risk, Goodyear acknowledges that in reviewing the evidence, we must credit appellees' best evidence. Goodyear frames the issue of extreme risk in terms of Carl's chance of contracting mesothelioma. A person who has not been exposed to asbestos has a one in 1,000,000 chance of contracting mesothelioma. Appellees' experts testified that Carl's exposure increased his chance of developing mesothelioma by as much as 22 times. Goodyear uses these numbers to calculate that Carl's chance of developing mesothelioma was one in about 45,000, which it asserts cannot be considered an extreme risk as a matter of law.
Goodyear's argument, however, focuses solely on the degree of risk or likelihood of injury. But this requirement is not viewed in a vacuum. Instead, we must look at whether Goodyear's acts and omissions created an extreme degree of risk-considering the probability and magnitude of harm. Further, statistical evidence of the probability of serious injury is not necessary to establish the objective component of gross negligence. See, e.g. , Mobil Oil Corp. v. Ellender , 968 S.W.2d 917, 923-24 (Tex. 1998) (in case where contract worker died of leukemia, defendant's failure to monitor contract workers for hazards of benzene, failure to warn them, and failure to provide them with protective gear was evidence defendant's acts and omissions involved extreme degree of risk); Zuniga v. Medina , No. 04-14-00360-CV, 2017 WL 2261767, at *2 (Tex. App.-San Antonio May 24, 2017, no pet. h.) (mem. op.) (where driver struck pedestrian, evidence that driver's actions in speeding through school parking lot on Sunday and failing to slow down and look both ways at exit involved extreme degree of risk).
Here, the evidence shows that Goodyear turned a blind eye to the dangers of asbestos in its Tyler facility for at least eleven years, from 1972 to 1983. In mid-1972, OSHA warned that exposure to asbestos fibers must be regulated because employees' lives were at stake and specifically mentioned mesothelioma. In response, *646 Goodyear called for routine air sampling to be done weekly until sufficient data was obtained, and after that, called for monthly sampling. But the jury could have determined that Goodyear did not do any sampling to protect its Tyler employees until 1983. Further, it did not warn its employees of the dangers of asbestos until then.
Next, there is no cure for mesothelioma and patients do not live long after diagnosis. The magnitude of harm was fast and certain death.
Based on these circumstances, the jury could have formed a firm belief that Goodyear's acts and omissions involved the likelihood of Carl's serious injury and an extreme degree of risk. See Brown & Root, Inc. v. Moore , 92 S.W.3d 848, 852 (Tex. App.-Texarkana 2002, pet. denied) (mesothelioma case in which court found legally sufficient evidence that defendant's conduct involved extreme degree of risk to workers who worked around asbestos insulation when it was torn out and reinstalled).
Even if we were to engage in a statistical analysis of the probability that a Goodyear Tyler employee would get mesothelioma, there was evidence that the actual chance of getting mesothelioma from working in the Tyler plant was much higher than one in 45,000. An epidemiological study of the employees at Goodyear's Tyler plant was published in 2007. The study, which did not include Carl Rogers as it predated his diagnosis, reported three cases of mesothelioma among long term employees at the plant. The study of about 3,000 employees found an unexpected "excess incidence of mesothelioma... among hourly white men." Thus, four out of about 3,000 workers in the Tyler plant were diagnosed with mesothelioma. Even if we exclude two of the four employees because they previously worked in a plant that manufactured asbestos insulation, this evidence nevertheless demonstrates a much greater chance of contracting mesothelioma at the Tyler plant than one in 45,000. Again, viewing the evidence in the light most favorable to the verdict, we conclude a reasonable trier of fact could have formed a firm belief that Goodyear's acts and omissions involved an extreme degree of risk.
2. Subjective Component
Next, Goodyear contends appellees did not prove the subjective component of gross negligence. Specifically, Goodyear asserts appellees did not prove Goodyear was actually aware of the risk involved and proceeded with conscious indifference. To this end, Goodyear argues that, to show it was aware of the risk involved, appellees had to prove that at the time of Carl's exposure (1974-1985), Goodyear had actual knowledge that the particular dose of asbestos exposure would likely cause mesothelioma. Goodyear maintains appellees' evidence showed only a general understanding that asbestos can cause mesothelioma.
Under the subjective element, actual awareness means the defendant knew about the peril, but its acts or omission demonstrated that it did not care. Boerjan v. Rodriguez , 436 S.W.3d 307, 311 (Tex. 2014) (per curiam). Appellees counter that Goodyear did not have to have actual knowledge that Carl's particular dose of asbestos exposure would cause mesothelioma. We agree with appellees because awareness of an extreme risk does not require proof that the defendant anticipated the precise manner in which the injury would occur or be able to identify whom the injury would befall. See U-Haul , 380 S.W.3d at 139. And we note that since Goodyear took no steps to monitor the asbestos levels in the air at the appropriate time and thus did not know the dose of *647 any employee, knowledge that a particular dose caused mesothelioma would not have changed anything. It was sufficient to show that Goodyear knew that exposure to low levels of asbestos could cause people to develop mesothelioma.
The jury could have determined the communications Goodyear sent to its plants between 1972 and 1981 showed its actual knowledge that exposure to low levels of asbestos could result in mesothelioma.
Further, in a deposition, the corporate representative for Goodyear, Joseph Holtshouser, was asked about the 1972 communication Goodyear sent out. He stated that as documented in the communication, Goodyear had actual subjective knowledge of asbestos hazards, including that it was a carcinogen and could cause lung cancer and mesothelioma. He also acknowledged that by 1972, Goodyear knew that if employees were going to be significantly exposed to asbestos, employees should be warned about that exposure and that protection should be provided.
Goodyear relies in part on Exxon Mobil Corp. v. Altimore in support of its argument that general knowledge of a risk is insufficient to show actual knowledge. 256 S.W.3d 415 (Tex. App.-Houston [14th Dist.] 2008, no pet.). In that mesothelioma case, the Houston court held that the evidence was legally insufficient to prove the objective prong of gross negligence, an extreme degree of risk of serious injury. Id. at 425. The plaintiff was the wife of a long time Exxon employee who claimed she herself contracted mesothelioma due to exposure to asbestos dust brought home on her husband's clothes. Id. at 416. In holding that there was no evidence of an extreme degree of risk to her, the court cited the fact that most of the plaintiff's evidence of the risk of injury came from epidemiological studies of work environments and she did not present any report or study in which researchers concluded family members of employees were exposed to an extreme degree of risk or any expert testimony of the same. Id. at 425. Further, the period of exposure in that case ended in 1972, described as "a crucial year in the history of asbestos research," as compared with 1985 in this case, so the information available to the defendants regarding the risk cannot be compared. See ids="8215995" index="15" url="https://cite.case.law/sw3d/256/415/">id. at 422. The case does not support Goodyear's argument that there is legally insufficient evidence of its actual awareness of the risk.
Goodyear also argues that appellees did not show that Goodyear was consciously indifferent to the knowledge of the risk posed by asbestos at its Tyler plant. Goodyear maintains that it took significant measures to reduce the hazards it knew asbestos posed and cites its industrial hygiene program. Goodyear asserts that it monitored and tested for numerous substances, including asbestos, as far back as the 1970s. It also points to the fact that it was never cited by regulatory bodies, such as OSHA, for asbestos problems.
But the jury could have determined that Goodyear's efforts to reduce asbestos hazards were not significant. For example, although Jackson testified at trial that he personally took samples for asbestos at the Tyler plant between 1972 and 1976, there was no written proof of his sampling. And Jackson's testimony was impeached with his deposition testimony, taken shortly before trial, that the first time Goodyear did any air monitoring was in 1978. Goodyear's CHAT report showed the total number of asbestos samples taken at the plant was thirty-six and that no samples of employees were taken until 1983. Goodyear also relies on 130 asbestos samples taken in 1984 as part of its asbestos abatement program, two of which were of tire machines.
*648 But those samples were not taken by Goodyear, but by a contractor hired to handle the removal of the pipe insulation. Thus, nothing other than the trial testimony of Jackson, which was impeached, showed that Goodyear monitored the asbestos exposure of its employees in Tyler before 1983.
Further, there was evidence of Goodyear's motives for not monitoring its employees. Specifically, in an August 1981 letter to plant managers and other company officers, Goodyear noted that certain concentrations of asbestos fibers in the atmosphere have been determined to be a health hazard. But it instructed plants not manufacturing "asbestos type products" to avoid being classified as an employer "where asbestos fibers are released" and thereby avoid having to implement a monitoring and medical surveillance program, citing the "considerable expense and duration" of such a program. And Goodyear instructed its facilities in which asbestos products were incidentally used to immediately avoid the obvious use of same.
Based on the preceding three paragraphs, the jury could have found by clear and convincing evidence that Goodyear acted with conscious indifference by failing to timely monitor and sample the level of its employees' exposure, warn employees or protect them from the danger of exposure, and comply with OSHA regulations. See Brown & Root Inc. v. Shelton , 446 S.W.3d 386, 394-96 (Tex. App.-Tyler 2003, no pet.). In other words, it could have determined Goodyear knew about the risks posed by asbestos, but its acts and omissions demonstrated it did not care. Having determined that the jury could have formed a firm belief or conviction that the gross negligence finding was true, we overrule Goodyear's first issue.
B. Issue Two: Is the causation evidence legally insufficient?
In its second issue, Goodyear asserts there is no evidence of causation because appellees failed to rule out the radiation treatment Carl underwent for lung cancer as a plausible alternative cause of the mesothelioma. Goodyear argues appellees had the burden to exclude other plausible causes of Carl's mesothelioma and did not do so. See Merrell Dow Pharms., Inc. v. Havner , 953 S.W.2d 706, 720 (Tex. 1997) ("if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty").
From our review of the record, it does not appear that Goodyear made this specific argument about the legal insufficiency of appellees' causation evidence in the trial court. To preserve a legal insufficiency challenge for appeal after a jury trial, the party must raise the specific complaint in the trial court by: (i) a motion for directed verdict; (ii) a motion for JNOV; (iii) an objection to the submission of the jury question; (iv) a motion to disregard the jury's finding on a vital fact issue; or (v) a motion for new trial. T.O. Stanley Boot Co., Inc. v. Bank of El Paso , 847 S.W.2d 218, 220 (Tex. 1992) ; Maya Walnut, LLC v. Lopez-Rodriguez , No. 05-16-00750-CV, 2017 WL 1684679, at *4 (Tex. App.-Dallas May 3, 2017, no pet. h.) (mem. op.).
In its appellate briefs, Goodyear maintains it preserved this issue by filing a JNOV motion and a motion for new trial both assailing question one, in which the jury found that the asbestos fibers in the Tyler plant were a proximate cause of Carl's mesothelioma. In their post-verdict motions, Goodyear did argue there was legally insufficient evidence the exposure to asbestos at the Goodyear plant caused *649 Carl's mesothelioma. But it did not mention radiation in connection with its legal insufficiency complaint. It argued among other things that appellees' experts failed to sufficiently quantify Carl's exposure. Goodyear mentioned radiation in its motion for new trial only in connection with a complaint the court erred in excluding Goodyear's expert testimony. And Goodyear did not mention radiation during the hearing on its post-verdict motions. In addition, Goodyear moved for directed verdict on grounds appellees failed to establish causation. But again it did not mention any failure to rule out radiation. Rather, Goodyear argued appellees failed to establish Carl's dose of exposure to asbestos. The cardinal rule of error preservation is that an objection must be clear enough to give the trial court an opportunity to correct the alleged error. Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd. , 249 S.W.3d 380, 387 (Tex. 2008).
At oral argument, Goodyear's counsel also asserted that the issue was preserved because it was thoroughly hashed out in front of the pretrial judge. Goodyear referred to its motion to exclude the testimony of appellees' experts, which the MDL judge denied. In the motion, Goodyear argued that appellees' expert opinions did not satisfy reliability standards because they failed to exclude other causes. But asking the MDL judge before trial to exclude appellees' experts on this basis does not absolve Goodyear of its responsibility to preserve its legal insufficiency complaint by informing the trial judge the evidence was legally insufficient to support the jury's verdict for this reason. See Maya Walnut , 2017 WL 1684679, at *4 (listing ways to preserve legal insufficiency points). Goodyear's pretrial motion to exclude evidence, denied by the MDL judge, was not sufficient to inform the trial judge that the evidence did not support the jury verdict because appellees failed to rule out radiation. See index="22" url="https://cite.case.law/citations/?q=2017%20WL%201684679">id. At no time was it clear that the trial court understood Goodyear to be making a legal insufficiency complaint about appellees' failure to rule out radiation. See TEX. R. APP. P. 33.1(a) ; Arkoma Basin , 249 S.W.3d at 387-88 ; Maya Walnut , 2017 WL 1684679, at *5 (complaint in JNOV and motion for new trial about insufficient evidence of cause in fact and damages did not preserve complaint about insufficiency of evidence of breach of standard of care).
Assuming Goodyear preserved its legal insufficiency complaint about causation, we overrule it. Appellees assert that because they met their burden to prove the asbestos was a proximate cause of mesothelioma, they were not required to rule out other potential causes of the disease. See Bostic v. Georgia-Pacific Corp. , 439 S.W.3d 332, 353 (Tex. 2014) (requiring claimants to establish dose of asbestos fibers to which decedent was exposed and prove with scientifically reliable expert testimony that the decedent's exposure to asbestos more than doubled his risk of contracting mesothelioma ). But as we understand Goodyear's argument, it asserts that appellees' expert testimony is legally insufficient to support the verdict. Although Goodyear does not bring an issue directly challenging the MDL judge's failure to exclude the testimony of appellees' experts, it complains their experts' opinions about causation are speculative and conclusory because they did not rule out radiation and do not constitute legally sufficient evidence. See Wal-Mart Stores, Inc. v. Merrell , 313 S.W.3d 837, 840 (Tex. 2010) (per curiam); City of San Antonio v. Pollock , 284 S.W.3d 809, 816 (Tex. 2009) ; E.I. du Pont de Nemours & Co., Inc. v. Robinson , 923 S.W.2d 549, 559 (Tex. 1995).
In making this argument, Goodyear ignores the fact that appellees got a summary judgment ruling from the MDL
*650 judge that there was no scientifically valid epidemiology to create a causal relationship between therapeutic radiation for lung cancer and mesothelioma. Goodyear has not challenged the summary judgment ruling in this appeal and did not mention it in its opening brief. In its reply brief, Goodyear urges that the summary judgment is unrelated to the sufficiency of the evidence. But we do not see how Goodyear can claim the evidence is insufficient because appellees failed to rule out radiation as a cause when it has not challenged the MDL's judge's determination that there was no causal connection between the radiation and mesothelioma in this case. This ruling effectively determined that the radiation was not a plausible alternative cause of mesothelioma in this case. Under the facts of this case, we cannot conclude the evidence of causation is legally insufficient for reasons put forth by Goodyear. We overrule Goodyear's second issue.
C. Issue Three: Did the trial court err in applying the exemplary damages cap?
In its third issue, Goodyear contends the evidence is legally or factually insufficient to support the jury's determination of appellees' pecuniary losses and therefore the exemplary damages awarded in the judgment must be recalculated and reduced from $2,890,000 to $1,150,000. For the following reasons, we agree.
1. The Pertinent Jury Findings and the Judgment
The jury found in response to question three that (i) appellees collectively suffered $900,000 in past and future "pecuniary loss" (consisting of $600,000 for Carl's wife and $150,000 for each of his two daughters), and (ii) appellees collectively suffered $2,700,000 in past and future noneconomic damages (specifically mental anguish and loss of companionship and society). But the trial court could not award any of these sums as compensatory damages because this is a workers compensation subscriber gross negligence case in which compensatory damages are statutorily precluded. See TEX. LAB. CODE § 408.001(a) - (b) ; Smith v. Atl. Richfield Co. , 927 S.W.2d 85, 87-88 (Tex. App.-Houston [1st Dist.] 1996, writ denied). Therefore, an award of damages that will compensate appellees for their injuries resulting from Carl's death is not before us.
However, the jury also found that appellees should be awarded $15,000,000 in exemplary damages. Accordingly, the trial court had to apply the civil practice and remedies code § 41.008(b)(1) exemplary damages cap to calculate a judgment amount. The trial court accepted the jury's pecuniary loss findings as equivalent to "economic damages" in the course of assessing a total of $2,890,000 in exemplary damages.
Resolving Goodyear's third issue requires us to first construe the exemplary damages cap statutes.[2]
*651 2. Statutory Construction Principles
"A fundamental rule of statutory construction is to ascertain and give effect to the Legislature's intent." City of San Antonio v. City of Boerne , 111 S.W.3d 22, 29 (Tex. 2003).
In so doing, we look to the statutory words' plain meaning. Abutahoun v. Dow Chem. Co. , 463 S.W.3d 42, 46 (Tex. 2015). And, we presume that the legislature selected and used statutory words with care, with every word or phrase in a statute having been intentionally used with a meaning and purpose. See State v. K.E.W. , 315 S.W.3d 16, 21 (Tex. 2010). We also consider the statute as a whole, reading all its language in context, and not reading individual provisions in isolation. See Ross v. St. Luke's Episcopal Hosp. , 462 S.W.3d 496, 501 (Tex. 2015).
Additionally, similar terms are to be interpreted in a similar manner. TGS-NOPEC Geophysical Co. v. Combs , 340 S.W.3d 432, 441 (Tex. 2011) (noscitur a sociis ). And, " '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.' " Sullivan v. Abraham , 488 S.W.3d 294, 297 (Tex. 2016) (quoting ANTONIN SCALIA & BRYAN A. GARNER , READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012)) (series qualifier canon).
Thus, we initially limit our statutory review to the text's plain meaning, in context, as the sole expression of legislative intent, unless the legislature has supplied a different meaning by definition, a different meaning is apparent from the context, or applying the plain meaning would lead to absurd results. Abutahoun , 463 S.W.3d at 46.
3. The Exemplary Damages Cap
Civil practice and remedies code § 41.008(b) caps exemplary damages at the greater of $200,000 or two times the amount of statutorily defined "economic damages" plus up to $750,000 in "noneconomic damages":
(b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:
(1)(A) two times the amount of economic damages ; plus
(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
(2) $200,000.
TEX. CIV. PRAC. & REM. CODE § 41.008(b) (emphasis added). (Given the jury's $15,000,000 answer to the exemplary damages question, subsection (b)(2) is not relevant to this case.)
Subsection (b)(1) has two prongs to be considered when applying the cap formula. The economic damages prong is unlimited in total amount but is limited by a base amount times a factor of two. Conversely, *652 the noneconomic damages prong is limited in the total amount that can be awarded up to the cap amount. Thus, if each prong represents a capped bucket of losses, how should the trial court have allocated among those buckets the $15,000,000 in exemplary damages using the jury's damages answers (totaling $3,600,000) and the undisputed evidence of other economic damages in form of medical expenses ($170,000) as the baseline against which to apply the cap formula?
4. Economic Damages
As used in the cap formula, "economic damages" means amounts that compensate a claimant for actual economic or pecuniary losses:
"Economic damages" means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages.
Id. § 41.001(4) (emphasis added). That is, as will be explained below, economic damages in this statute are existing in fact, real monetary losses like lost wages, the cost to obtain services that another previously provided for free or at a lower cost, or that the defendant's misconduct compelled the claimant to seek out.
To begin, in common usage, "pecuniary" means money. See Pecuniary , NEW OXFORD AMERICAN DICTIONARY (2001) ("adj. formal of, relating to, or consisting of money"); Pecuniary , BLACK'S LAW DICTIONARY (10th ed. 2014) ("adj. (16c) Of, relating to, or consisting of money; monetary, ") (emphasis original); Pecuniary , BRYAN A. GARNER , A DICTIONARY OF MODERN LEGAL USAGE (3d ed. 2011) ("Pecuniary = relating to or consisting of money"). Likewise, Black's Law Dictionary defines a "pecuniary loss" as, "A loss of money or of something having monetary value." Loss ? pecuniary loss , BLACK'S LAW DICTIONARY . Thus, a pecuniary loss means a loss of money or something of monetary value. And, an "economic loss" similarly means: "A monetary loss such as lost wages or lost profits." Economic loss , BLACK'S LAW DICTIONARY . Accordingly, for our purposes in this case the words "economic," "pecuniary," "money," and "monetary" are synonymous.
Furthermore, Black's Law Dictionary defines "actual" as an adjective meaning, "Existing in fact; real." Actual , BLACK'S LAW DICTIONARY . Thus, an actual pecuniary loss would be an existing in fact, real loss of money or something having monetary value. And an actual economic loss is an existing in fact, real monetary loss such as lost wages, lost profits, or the like.
It follows then from these words' similar plain meanings and their juxtaposition in the definition of "economic damages," that the phrase "actual economic or pecuniary loss[es]" means those types of losses that are supported by evidence of an existing in fact, real monetary loss like lost wages, lost profits, or the increased expenditures associated with obtaining replacement or new services. See TGS-NOPEC Geophysical Co. , 340 S.W.3d at 441 (similar terms are to be interpreted in a similar manner); Sullivan , 488 S.W.3d at 297 ("[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series"). Stated differently, by using the phrase "actual economic or pecuniary loss" to describe the nature and extent of the available losses useable in the cap calculation's economic damages prong, the legislature emphasized that amounts must be based on evidence of existing in fact, real lost economic value.
Based on the preceding four paragraphs alone, the ultimate question here is, "What *653 sum of money is the evidence legally or factually sufficient to show that these particular appellees actually lost in fact due to no longer receiving Carl's care, maintenance, support, advice, counsel and reasonable monetary contributions (gifts)?" For example, assuming Carl had been an accountant who did their tax returns for free, how much would they have to pay to replace that free service? Or, as was shown here, how much will the wife have to pay for household services that Carl previously provided for free? Those are examples of actual economic or pecuniary losses that would be includable under the cap's economic damages prong if there was evidence supporting them. On the other hand, although Carl's practical advice to his family had some unquantified, inherent value to them, losing such advice in the future would not be an actual economic or pecuniary loss to appellees if there is no evidence of an associated monetary impact on them to replace that advice and counsel. These examples illustrate the difference between (i) the undifferentiated, non-monetized "pecuniary losses" the jury found in response to question three and (ii) the types of actual economic and pecuniary losses that the legislature made includable when determining the economic damages prong in § 41.008(1)(b)(A). The latter are included in that prong, whereas, the former are not.
5. Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Inc.
The supreme court's Waste Management opinion supports the preceding analysis. The issue there was whether damages to a company's reputation in a business defamation case were economic damages for exemplary damages cap purposes. In holding that those damages were nonpecuniary losses, and thus not includable in the economic damages prong, the supreme court relied on Professor Dobbs's distinctions between pecuniary and nonpecuniary losses in personal injury actions:
["]Plaintiffs prove three basic elements of recovery in personal injury actions. (1) Time losses. The plaintiff can recover loss or [sic] wages or the value of any lost time or earning capacity where injuries prevent work. (2) Expenses incurred by reason of the injury. These are usually medical expenses and kindred items. (3) Pain and suffering in its various forms, including emotional distress and consciousness of loss.["]
Professor Dobbs's first two categories concern pecuniary losses, while his third involves non-pecuniary losses. Applying his categorical delineations for a personal injury to this case, injury to reputation falls into the third category as a non-pecuniary loss, because it is neither time lost nor an expense incurred.
See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc. , 434 S.W.3d 142, 153 (Tex. 2014) (quoting 2 DOBBS , LAW OF REMEDIES § 8.1(1)). This passage instructs that economic damages in the exemplary damages cap formula are those losses shown to be actual (that is, existing and real) monetary losses that can be measured in fact-based monetary amounts.
Waste Management 's distinction between economic and noneconomic losses is also supported by other authorities. For example, in personal injury cases generally, the supreme court holds that economic damages compensate an injured party for monetary losses, such as lost wages, lost earning capacity, and medical expenses; whereas, noneconomic damages compensate for losses that cannot be objectively measured and quantified:
When someone suffers personal injuries, the damages fall within two broad categories-economic and non-economic damages. Traditionally, economic damages are those that compensate an injured *654 party for lost wages, lost earning capacity, and medical expenses. Non-economic damages include compensation for pain, suffering, mental anguish, and disfigurement.
Golden Eagle Archery, Inc. v. Jackson , 116 S.W.3d 757, 763 (Tex. 2003).
6. Moore v. Lillebo
The supreme court's decision in Moore v. Lillebo , 722 S.W.2d 683, 687-88 (Tex. 1986), further supports the conclusion that actual economic or pecuniary losses require some proof of direct economic losses to be included in the cap calculation. That case involved parents of an adult son who sought to recover mental anguish damages resulting from his wrongful death. The primary holding there was that wrongful death survivors do not have to prove an actual physical injury manifestation to recover mental anguish damages. See ids="9982053" index="43" url="https://cite.case.law/sw2d/722/683/#p687">id. at 685-86. The court also held that there was evidence that warranted submitting damages questions on loss of society and companionship. See ids="9982053" index="44" url="https://cite.case.law/sw2d/722/683/#p687">id. at 686-87.
Furthermore, although neither the recoverability of pecuniary losses in wrongful death cases nor the nature of proof to support a finding of such losses was at issue in Moore , the court took the occasion to generally define the nature of pecuniary losses in wrongful death cases using terms like those that appear in question three in the present case,
as the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that the [plaintiffs] would in reasonable probability have received from [the deceased] had [the deceased] lived.
Id. at 687 (emphasis added). But-and importantly-the supreme court did not purport to address whether these pecuniary losses had to be supported by evidence of actual monetary losses to be recoverable. To the contrary, the court said that these types of losses, unlike mental anguish and loss of society and companionship losses, represent "direct economic losses" and must be "of a pecuniary [monetary] value." Id. This means that these items cannot be merely emotional damages, they must reflect an identifiable monetary value.
Additionally, the supreme court said that the character of appropriate pecuniary losses varies from case to case depending on the facts and circumstances:
The definition [of pecuniary loss] will vary according to the class of beneficiary and decedent, e.g. spouse, parent, adult child or minor child.
Id. Thus, what may pass for evidence of lost monetary contributions a deceased able-bodied parent likely would have made to a young, minor child may not pass for evidence of lost monetary value that an elderly, disabled parent likely would have made to middle-aged, independent children or a spouse.
Therefore, Moore supports Goodyear's argument that the pecuniary loss amounts the jury found can be included in the two times economic damages bucket only to the extent there is some evidence in this case showing an actual (existing and real) monetary loss associated with those components. Or, at least, Moore does not suggest otherwise.
7. Excel Corp. v. McDonald
Excel Corp. v. McDonald , 223 S.W.3d 506 (Tex. App.-Amarillo 2006, pet. denied), squarely addresses whether, when awarding compensatory pecuniary loss damages in a wrongful death case, those damages must be supported by legally sufficient evidence of an associated actual monetary loss. Id. at 509-10.
In that case a college age son was killed in a car accident. His mother sued to recover wrongful death damages, including *655 damages for her pecuniary losses. The jury, based on a definition of pecuniary losses like the one in the present case, found for the mother and awarded her $150,000 in past pecuniary loss damages. The trial court entered judgment accordingly.
Excel's appeal presented a single issue complaining that the trial court erred by rejecting Excel's argument there was legally insufficient evidence supporting the jury's finding that the mother "sustained past pecuniary loss in the amount of $150,000." According to the Amarillo court:
Excel's brief succinctly summarizes the evidence and its argument as follows: "The evidence shows that Jason McDonald was a fine young man, who had graduated from high school and started college, was living with his mother, was a loving and attentive son, and was protective and supportive of his mother. He worked part-time while attending school, worked in the summer, made some financial contributions to his mother, mowed the lawn, did some house maintenance, and did domestic tasks for his mother. There is evidence which would support some amount of pecuniary loss from the date of Jason's death, July 10, 2003, to the date of the verdict, July 1, 2004, but the finding of $150,000.00 is pure fiction." (underlining in original).
Id. at 508. The court then analyzed the evidence and rejected the mother's argument that the trial court properly awarded the full $150,000, despite the absence of evidence supporting an actual monetary loss of that amount, because "proof of pecuniary loss in the wrongful death context is not susceptible 'to the kind of pencil and paper calculation which might be used ... in a commercial case.' " Id. at 509 (ellipsis original).
The Amarillo court therefore reversed the award and remanded the case for new trial because there was some evidence of actual monetary pecuniary losses. In so doing, the court held that:
The jurors could apply their knowledge and experience to estimate the value of the household services Jason rendered his mother, without proof of their value. Missouri-Kansas-Texas R.R. Co. v. Pierce , 519 S.W.2d 157, 160 (Tex. Civ. App.-Austin 1975, writ ref'd n.r.e.) ; Arando v. Higgins , 220 S.W.2d 291 (Tex. Civ. App.-El Paso 1949, writ ref'd n.r.e.). A jury's discretion in doing so is not unlimited, however, and must be based on the evidence adduced. Pierce , 519 S.W.2d at 160. The evidence shows that Jason was extraordinarily diligent in helping his mother around the house but no evidence suggests that the nature or value of his services was out of the ordinary. No reasonable view of the evidence concerning Jason's services to his mother supports an estimated value even approaching $150,000 for the period before the verdict. We must agree with Excel that no evidence supports the jury's finding that McDonald suffered direct economic losses in the past of $150,000. We conclude the trial court erred by denying Excel's motion to disregard the finding, and we sustain Excel's issue on appeal.
Id. at 510.
Conceptually, Excel is indistinguishable from the present case. Moreover, if the evidence was legally insufficient to support an award of compensatory damages based on the alleged pecuniary losses in Excel , then the argument that similar evidence here constitutes legally sufficient evidence under the cap statute's more restrictive standards is even less compelling.
Following Excel 's reasoning, Moore 's direction, and Waste Management ' s analysis, we hold that a fact finding of pecuniary losses must be supported by evidence *656 of actual monetary losses like lost wages, replacement costs, or other financial contributions, in light of the facts and circumstances concerning that decedent's relationship with the claimant and that decedent's actual financial contribution to that claimant, before those findings can be used as economic damages when calculating the exemplary damages cap.
8. Appellees' Authorities
Appellees' brief cites three cases as supporting the legal sufficiency of the evidence supporting the pecuniary loss answers to question three and their use as baseline amounts for the cap calculation: (i) Christus Health v. Dorriety , 345 S.W.3d 104 (Tex. App.-Houston [14th Dist.] 2011, pet. denied) ; (ii) Samco Properties., Inc. v. Cheatham , 977 S.W.2d 469 (Tex. App.-Houston [14th Dist.] 1998, pet. denied) ; and (iii) John Deere Co. v. May , 773 S.W.2d 369 (Tex. App.-Waco 1989, writ denied). Based on these authorities, appellees urge that their pecuniary loss evidence is legally sufficient here because services "such as nurture, care, education, and guidance, have a monetary value in addition to any financial contribution[,]" and that the measurement of pecuniary losses "is an inherently speculative and imprecise undertaking" that "is best left to the jury's common sense and sound discretion [.]" Although those or similar statements appear in one or more of appellees' cases, none of those cases involved the exemplary damages cap statutes that we face in the present case. This distinction is important for several reasons:
One, the issue in each of those cases was the legal sufficiency of the evidence to support pecuniary losses for compensatory damages awards. But compensatory damages are not at issue here. We are not compensating appellees for their non-exemplary damage losses. Instead, the question is to what degree should Goodyear be punished for its gross negligence. The legislature has spoken on that topic by placing limits on the amounts by which that punishment may be assessed.
Two, as discussed in Part II.C.4 above, the legislature limited the degree of exemplary damages punishment by defining "economic damages" for cap calculation purposes by using the phrase "actual economic or pecuniary loss" to require proof of actual (existing and real) monetary losses. That type of limiting language does not appear in any of appellees' cases.
Three, both Christus and Samco had extensive expert testimony quantifying the plaintiffs' pecuniary losses and the issues were whether there was legally sufficient evidence supporting the jury's answers given purported defects in that evidence. But, as discussed in Part II.C.9 below, there was no such expert testimony in the present case, and there was no evidence attempting to quantify the financial impact that the adult daughters incurred due to their father's death. Likewise, as was the case in Excel discussed in Part II.C.7 above, the only evidence quantifying the financial impact that the wife incurred due to her husband's death was of a limited amount ($30,000) nowhere near the amount the jury awarded ($600,000).
Four, although in John Deere no witness placed a specific monetary value on the deceased father's personal services to his surviving minor daughter, the court found legally and factually sufficient evidence of her pecuniary losses for compensatory damages purposes because there was evidence that the father had been providing parental services and contributing financial support to his minor daughter. Whereas here, the daughters were adults living on their own, and there was at best limited evidence of Carl's economic contribution to his wife. To the extent John Deere and Excel conflict, Excel is the more persuasive *657 authority given the present case's facts and the statutory language we must apply.
Accordingly, we conclude that appellees' cases do not indicate that there is legally sufficient evidence supporting the actual economic or pecuniary losses that would be required to uphold the trial court's exemplary damages cap calculation in this case.
9. Application of the Law to the Facts
Here, Goodyear complains that the trial court erred by including in the two times economic damages prong amounts the jury found as pecuniary losses for which there is legally insufficient evidence supporting those sums as actual monetary losses. Specifically, Goodyear argues that there is no evidence of any actual monetary loss either daughter associated with losing their father. Goodyear similarly argues that the wife's evidence of lost monetary value was at most $30,000. Thus, according to Goodyear, $30,000 was the maximum amount of pecuniary losses includable in the cap formula's two times economic damages prong. Accordingly, Goodyear asserts that the punitive damages must be reduced and recalculated to be $400,000 (consisting of $170,000 in undisputed economic losses consisting of medical expenses plus $30,000 as the maximum pecuniary losses for the wife-times two) plus the $750,000 cap to § 41.001(12) noneconomic losses the jury found for a total sum of $1,150,000. We agree with Goodyear for the following reasons.
One, there is no evidence that either daughter suffered any actual economic damages, as the legislature defined that term in § 41.001(4) due to no longer being able to receive her father's advice and counsel or otherwise. There was no expert testimony regarding the daughters' pecuniary losses, and there was no evidence attempting to quantify the financial impact on the daughters due to their father's death. In the event of a retrial, it will be taken as established as a matter of law that Carl's death did not cause the daughters any past or future actual pecuniary losses within the meaning of § 41.001(4).
Two, similarly, there is legally insufficient evidence that the wife suffered any actual pecuniary losses beyond the $30,000 Goodyear refers to. We quote Vicki's testimony at length to show that the testimony supported only a limited amount of actual pecuniary losses:
Well, he was a handyman too. He liked to piddle around the house. He liked to build things. So if something needed fixed [sic], like some appliances-some, you know, got so computerized, you know, he couldn't work on that. But he liked to, you know, build things.
He'd fix things. If the house needed painting, he painted it.
He'd always do the yard work....
He learned to put up wallpaper. He did that.
He liked to change things. So I might see a picture in a magazine and say, well, this looks pretty. And he'd say go get the stuff and I'll do it. I saw the picture in a catalog. I don't remember if it was a bed or not, that I thought was real pretty. And he says, well, I can do that. And he put some paneling-I don't know the official name of it.
Q. Like wood paneling?
A. Yeah. Kind of halfway up and then this border and then he painted, and then I ordered the bedspread and curtains and stuff. When he got through, it looked exactly like that picture in the catalog, you know. And he did that 'cause I liked it.
*658 ....
We didn't buy anything unless we thoroughly talked it over. We had one account, you know, and we talked about how to spend the money. And if anything special was coming up like a vacation or braces, dance lessons, something we'd maybe want to do at the house, he would work overtime. He worked eight hours like he worked twelve hours a lot.
Occasionally, he worked 16 hours at the plant. But that didn't make me happy when he did that so he didn't do that too often because he didn't want to hear me griping.
But he would work a lot according to what we needed. And then Courtney, when she got married, he worked a lot, you know, to pay for her wedding. And it was beautiful.
He just spoiled us. I mean, he was the head of the household. And sometime [sic] I worked; sometime [sic] I didn't, because I had difficulty being pregnant sometime [sic]. And so we decided I would just stay home when I was pregnant and-
Q. Is he kind of the foundation of the family?
A. Definitely, definitely.
Q. Was he that shoulder that you had to cry on?
A. Oh, yes.
Q. Do you have that anymore?
A. No....
....
Q. And-and I think Mr. Rogers retired from Goodyear in about 2004?
A. Right.
Q. And he took a disability retirement?
A. Yes.
Q. Okay. And that was due to a back injury-
A. Right.
Q. -the pains that he had in his back?
A. Right.
Q. Okay. Ma'am, in listening to your testimony and your daughter's testimony, you talked about how good of a handyman Mr. Rogers was. And I know that you mentioned that he had a shop in the back yard. I was just wondering, did he build this shop on his own?
A. Him and his brother did.
Q. Okay.
A. His brother did most of it.
Q. Okay. I'm sorry. Go ahead.
A. Carl is mostly entertainment, but he did do some.
Q. And I was just wondering. I was, like, did he put the walls up and the roof on top of the shop?
A. Him and his brother did.
Q. Okay. And I think you also mentioned in a deposition that you gave that Mr. Rogers helped with the cars, your family cars?
A. Occasionally. Nothing major. Mostly-it probably mostly his pickup. He had a [sic] older pickup that-'cause he always made sure that I had a good car because he said if you and girls are going to be out in it, we're going to have something reliable.
Q. Right.
A. So it was mostly piddly stuff like maybe-used to you could do, like, your own oil change or something like that. But then later on everything got so computerized. And then he hurt his back, so he-you know, he didn't really do anything after that.
Q. Did you say that Mr. Rogers would change the brakes on his own family vehicles?
*659 A. He would do things. I would see him going in and out. I wasn't out there, but I couldn't say exactly what he was doing to the car. And he had a good friend that was a mechanic and he would talk to him and sometimes go down there. ...
But he did mess with the car, but I can't-I think he might have did [sic] brakes one or two times, but I can't even say that for sure.
Q. Okay. All right. Ms. Rogers, I just want to talk to you. The same questions that I had for your daughters, which-about pecuniary damages, not any sort of mental anguish or pain and suffering, but sort of the monetary loss that you've suffered. And you mentioned the fact that Mr. Rogers used to do the yard work. And I just didn't know. Did you have a dollar amount that you've had to pay since your husband's passing for the yard work that he used to do?
A. Yes. I pay-every time it's mowed I pay-it kind of depends on what needs to be done. I have a lot of trees and sometime [sic] there's limbs that fall and shrubs that need to be trimmed, and sometimes I pay anywhere from 50-to $60 every time, you know, I need yard work done.
Q. Would that be on a monthly basis or how often do you-
A. Well, I need it mowed-this time of year I need it mowed, you know, about once a week.
Q. Okay.
A. I don't need-you know, the shrubs don't need to be trimmed every week and there's not always-and a lot of times, you know, I will get out there and do some things myself. Not very often.
Q. So for a week-what amount of money would you pay on a weekly basis just for ordinary-
A. Usually around 55.
Q. And does your brother help you with that yard work?
A. Yes.
Q. And, ma'am, would you be able to give us an estimate on a dollar amount for the cost of home repairs that your husband used to help you with for fixing the house that you've had to incur after, since his death?
A. Well, since he died I did have to get new shingles put on, but he wouldn't have done that anyway.
I need to do a lot around the house. Like, it needs to be painted. I need new floors because there was a part of the house had gotten flooded and stuff. And I haven't done any of it.
I've had a really hard time making some decisions because Carl was a really great help with that. Because when we had new floors put in he tried to do it one time. He said he didn't care how many hours he had to work, he would never do that again.
But we had people coming in to put floors in. He would move the furniture out and sometimes he even took up the old flooring. And I said, well, aren't we paying them for that? And he said, well, I can do it and save them some time. But-and now I keep thinking if I get floors, you know, I can't move all this out. So they're going to have to do it and it's going to cost more.
But it's just little things like that. And I need to do a lot to the house but I just haven't done it because I've always had him there. And I just have a hard time just-
Q. Making the decision.
*660 A. -making the decisions and getting it done.
Q. I understand. And so you haven't-you haven't gone out and gotten any estimates for how much it's going to cost to paint it?
A. I've gotten some estimates and I brought home samples, but that's as far as I've gotten.
Q. Do you have a guesstimate about-I guess you said Carl said he wasn't ever going to do floors again-
A. Exactly.
Q. -so we won't worry about that. buT maybe for the painting of the house?
A. I haven't gotten an estimate on painting yet, but I know I've got a [sic] estimate on windows. We need new windows and it was 6,000 something. And that's the only official estimate that I've gotten.
Q. And would Mr. Rogers have been able to replace those windows?
A. Him and his brother would have probably tried to do it.
Q. Okay.
A. Definitely.
We agree with Goodyear that Vicki's testimony is legally sufficient to establish pecuniary losses only in the form of yard work services that Carl used to perform. She testified that she paid $55 per week for those services when they were needed. Goodyear argues that, assuming yard services are needed during the spring and summer, the annual cost of yard work would be $1,500 ($55 times roughly 27 weeks). This works out to $7,500 in past economic damages and, assuming Carl would have performed those service for another 15 years, $22,500 in future economic damages (not reduced to present value).
Just as the evidence of the son's household services and contributions in Excel was not legally sufficient evidence that one year of those services was worth $150,000, so too Vicki's testimony about other services Carl might have provided in the form of future painting, car repairs, and window replacement-especially given his back injuries that led to his 2004 disability retirement and his brother's significant involvement in those types of activities-was too vague and speculative to be evidence of $600,000 in actual pecuniary losses. See Excel , 223 S.W.3d at 510. Her testimony would not, under Excel , be legally sufficient to support an award of such compensatory pecuniary damages, let alone be legally sufficient under the more exacting exemplary damages cap standard the legislature implemented by adding the word "actual" to § 41.001(4) to accentuate the required economic or pecuniary losses in that context. We therefore conclude that the evidence is legally insufficient to support a finding that Vicki suffered more than $30,000 in past and future economic damages, above and beyond the $170,000 of medical expenses the parties stipulated to.
Because there is legally insufficient evidence supporting more than $200,000 in economic damages to be included in the cap calculation, we need not reach Goodyear's factual insufficiency argument.
Applying the § 41.008(b) cap yields a maximum exemplary damages recovery of $1,150,000, that being the sum of (i) two times appellees' economic damages and (ii) $750,000 (the statutory maximum for exemplary damages based on noneconomic damages). Accordingly, we suggest remittitur of $1,740,000 of the $2,890,000 exemplary damages awarded in the trial court's judgment.[3] See id.
*661 III. DISPOSITION
We overrule Goodyear's first two issues and sustain its third issue as follows: We suggest remittitur of exemplary damages exceeding $1,150,000. In accordance with Texas Rule of Appellate Procedure 46.3, if appellees file with this Court within 15 days from the date of this opinion a remittitur of $1,740,000, we will modify the trial court's judgment to award appellees exemplary damages of $1,150,000 in accordance with the remittitur and affirm the trial court's judgment as modified. If the suggested remittitur is not filed timely, we will reverse the trial court's judgment and remand the case for a new trial. See TEX. R. APP. P. 44.1(b).

The amount of asbestos that a person has breathed in is described in terms of fibers per cubic centimeter, or cc, of air. An adult breathes in about 500 ccs of air in one breath. Thus, if there are two fibers in one cc of air, a person taking a normal breath breathes in 1,000 asbestos fibers. If a person is breathing in two fibers per cc of air where they work and they do so for seven years, one would say they had fourteen fiber years per cc.

Appellees' motion for judgment on the verdict asked the trial court to apply the statutory "economic damages" definition when calculating the permitted exemplary damages subject to the statutory cap formula, quoted the statutory definition of "economic damages" as requiring "actual economic or pecuniary loss[es]," and asked the trial court to use the full amount of jury-found pecuniary losses when calculating the cap amount.
Asserting the same arguments it makes on appeal, Goodyear responded by referring to the statutory "economic damages" definition and arguing that there was (i) no evidence that either daughter suffered any actualized monetary losses and (ii) no legally or factually sufficient evidence that Vicki suffered actualized monetary losses beyond the $30,000 for yard services and $170,000 in medical expenses discussed in Part II.C.9.
The trial court was thus fully apprised of the parties' agreement that actual economic or pecuniary losses were required to calculate awardable exemplary damages in this case. By rejecting Goodyear's arguments and entering judgment on the verdict, the trial court impliedly found that the jury-found pecuniary losses were also actual pecuniary losses. Tex. R. Civ. P. 279. Goodyear's response to appellees' motion for judgment preserved Goodyear's trial court argument for appeal. See Tex. R. App. P. 33.1(a) ; Burbage v. Burbage , 447 S.W.3d 249, 257 (Tex. 2014) ("[T]he objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem."); In re S.H.V. , 434 S.W.3d 792, 801 (Tex. App.-Dallas 2014, no pet.) (party must both "take proper action to make the trial judge aware of the complaint and obtain a ruling, either express or implied").

We note that the Excel court did not suggest a remittitur after holding that there was no evidence to support the jury's $150,000 past pecuniary loss finding. See 223 S.W.3d at 510. In Excel , the evidence supported only an indeterminate lesser past pecuniary loss award, but in this case we can ascertain with certainty the maximum amount of economic damages that the evidence will support. See Khorshid, Inc. v. Christian , 257 S.W.3d 748, 769 (Tex. App.-Dallas 2008, no pet.) (suggesting remittitur of part of exemplary damage award after concluding that the common law and the Constitution permitted an award no larger than $12,000). On the facts of this case, Khorshid is more applicable than Excel .