**AFFIRMED in part; REVERSE and RENDER in part; REMAND and Opinion Filed May 13, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01490-CV**

**PAUL MUNDHEIM, MARLA MUNDHEIM, AND THE MUNDHEIM FIRM, PLLC, Appellants**
**V.**
**SCOTT LEPP AND AMY TORRES LEPP, Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-18-01169-D**

## MEMORANDUM OPINION

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Smith

Paul Mundheim, Marla Mundheim, and the Mundheim Firm, PLLC, appeal the trial court's judgment in favor of Scott Lepp and Amy Torres Lepp. The Mundheims challenge the legal and factual sufficiency of the evidence to support the jury's findings regarding (1) Scott's recovery of damages for the Mundheims' fraud, (2) Scott's recovery of exemplary damages, (3) Amy's recovery on her breach of contract claim, (4) Amy's recovery of damages for the Mundheims' fraud, and (5) Amy's recovery of exemplary damages. The Mundheims also complain the trial court erred in not requiring Amy to elect her remedies and awarding Amy attorney's

fees. We affirm the trial court's judgment in part, reverse and render in part, and reverse and remand in part.

The record shows Amy was employed by Fidelity Title Company beginning in 1997, and she first met Paul in approximately 2005. Paul was a fee attorney at Fidelity. In 2013, Paul and Amy discussed their frustrations at work, and Paul said he wanted to go back out on his own but did not have any money. Amy assured Paul that she "could take care of it." Amy and Paul decided they were going to go into business together and open a title company. Paul did not mention his belief that non-lawyers such as Amy and Scott, Amy's husband at the time of trial, could not actually be owners of a title company. A few weeks later, Amy and Scott met with Paul, and it was discussed that Scott was going to put up the $50,000, and Amy was going to work at the company full time. In return, Scott was going to be a twenty percent owner, and Amy was going to be a forty percent owner. The terms of the partnership and the parties' interests in the company were never put in writing. Scott gave Amy $50,000 in cash, and Amy gave Paul the money. Over the next few months, Paul deposited the cash in the bank in a series of deposits under $10,000 each.

For four years, the title company was very successful, earning between $450,000 and $500,000 per month. During that time, Scott and Amy were treated as owners of the company and received distributions in keeping with what they believed were their percentage ownership interests and were also given access to the

company's profit and loss statements. In the summer of 2017, Paul indicated to Amy that he hated the business and wanted out. Paul said he was not sure the company was "going to have the income that we've always had moving forward," and he thought the market was "going to crash."

Instead of getting out of the business, Paul became an employee of Alamo and Fidelity and received a $400,000 "bonus," document preparation fees of approximately $250,000 per year, and commissions of approximately $3000 per month. The company in which Amy and Scott invested their time and money thus effectively ceased to exist, and Amy and Scott received nothing.

On October 20, 2017, Amy entered into a "settlement agreement and mutual release" with the Mundheim Firm and Paul and Marla. Among other things, the agreement divested Amy of any interest in the company and provided: (1) the parties waived all claims for fraud; (2) Amy would receive payments totaling $301,000; (3) the parties would bear their own "costs, expenses, and attorney's fees incurred in connection with any future Litigation"; and (4) the parties would keep the terms and contents of the agreement confidential. Scott was not a party to the agreement.

Amy received an initial $100,000 payment and a second $50,000 payment. However, Amy received no further payments. On March 2, 2018, Scott sued Paul, Marla, and the Mundheim Firm asserting they failed to pay Scott his share from the company. Among other things, Scott asserted causes of action for breach of contract, breach of fiduciary duty, and fraud. In April 2018, Amy intervened in the suit

asserting causes of action for breach of contract. Amy later added claims of fraud and fraudulent inducement. The case was tried before a jury, which returned a unanimous verdict in favor of Scott and Amy awarding Amy damages for the Mundheims' breach of the agreement and awarding Scott and Amy damages for the Mundheims' fraud, exemplary damages, and attorney's fees. This appeal followed.

**Evidentiary challenges to jury findings**

Appellants challenge both the legal and factual sufficiency of the evidence to support the adverse jury findings. "When an appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding." *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). We view the evidence in the light most favorable to the fact finding, indulging every reasonable inference that would support it and disregarding contrary evidence unless a reasonable factfinder could not. *Bos v. Smith*, 556 S.W.3d 293, 300 (Tex. 2018). "When reviewing the record, we determine whether any evidence supports the challenged finding." *Fulgham*, 349 S.W.3d at 157. "If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails." *Id.*; *see Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (more than a scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

–4–

In a challenge to the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding in a neutral light. *Fulgham*, 349 S.W.3d at 157 (citing *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). "We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust." *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). The fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We defer to the jury's implicit determinations of credibility and the weight to be given to the evidence. *Wise v. SR Dallas, LLC*, 436 S.W.3d 402, 408 (Tex. App.—Dallas 2014, no pet.). As long as the evidence falls within the "zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). In conducting a factual sufficiency review, we should detail the evidence relevant to the issue in consideration and clearly state why the finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

In their first set of issues (issues 1.a though 1.k), the Mundheims argue the evidence is insufficient to support the jury's findings regarding Scott's fraud claim against the Mundheims and his resulting damages. The Mundheims also argue Scott

failed to secure findings necessary to support an exemplary damages award. Under this set of issues, the Mundheims' arguments focus on the jury's findings that (1) Paul, Marla, and the Mundheim Firm committed fraud against Scott; (2) clear and convincing evidence showed the harm to Scott resulted from the fraud committed by Paul, Marla, and the Mundheim Firm; (3) Paul, Marla, and the Mundheim Firm had actual awareness of the falsity of the representation or promise the jury found to be fraud; (4) $80,000 would fairly compensate Scott for damages resulting from the fraud; and (5) $64,000 each from Paul, Marla, and the Mundheim Firm should be assessed as exemplary damages.

In their next issue, the Mundheims argue the evidence is insufficient to support the jury's findings regarding Amy's breach of contract and fraud claims against the Mundheims and her resulting damages. The Mundheims also argue Amy failed to secure findings necessary to support an exemplary damages award. Under this issue, the Mundheims' arguments focus on the jury's findings that (1) Paul, Marla, and the Mundheim Firm breached their contract with Amy; (2) $151,000 would fairly compensate Amy for damages resulting from the breach of contract; (3) Paul, Marla, and the Mundheim Firm committed fraud against Amy; (4) clear and convincing evidence showed the harm to Amy resulted from the fraud committed by Paul, Marla, and the Mundheim Firm; (5) Paul, Marla, and the Mundheim Firm had actual awareness of the falsity of the representation or promise the jury found to be fraud; (6) $160,000 would fairly compensate Amy for damages resulting from the

–6–

fraud; and (7) $96,000 each from Paul, Marla, and the Mundheim Firm should be assessed as exemplary damages.

**Fraud**

The Mundheims argue the evidence is insufficient to support any fraud finding by the jury including common law fraud, fraudulent inducement, and fraud by nondisclosure. A common-law fraud claim requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015).

The Mundheims argue the evidence was insufficient to establish the elements of misrepresentation, reliance, causation, and damages. The record reflects that Paul represented that Scott would own twenty percent of the company and Amy would own forty percent. The terms of the partnership and the ownership structure were never put in writing because Amy and Scott trusted the Mundheims and relied on the Mundheims' good faith. Scott invested $50,000 in the company, and Amy worked full-time at the company. Amy and Scott were thereafter treated as owners of the company until Paul accepted the $400,000 "bonus" from Alamo, and the company was absorbed into Alamo. Scott received nothing to compensate him for his lost interest in the company. The jury could have found the Mundheims

committed fraud against Scott by taking his $50,000 and misrepresenting that Scott owned twenty percent of the company.

Amy also lost her interest in the company. Therefore, the jury could have found that the Mundheims committed fraud against Amy for the four years she labored under the belief that she actually owned forty percent of the company. We conclude this evidence is legally and factually sufficient to establish the Mundheims' common-law fraud against Amy and Scott. *See Fulgham*, 349 S.W.3d at 157; *Zorrilla*, 469 S.W.3d at 153.

Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance made with no intention of performing at the time it was made. *Id.* Fraudulent inducement arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). In a fraudulent-inducement claim, the "misrepresentation" occurs when the defendant falsely promises to perform a future act while having no present intent to perform it. *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019). The plaintiff's "reliance" on the false promise "induces" the plaintiff to agree to a contract the plaintiff would not have agreed to if the defendant had not made the false promise. *Id.*

Under this sub-issue, the Mundheims argue that, even if they did tell Scott he would be an owner of the company, there is insufficient evidence to show the Mundheims did not intend to perform on that promise. Further, the Mundheims

argue the fact that Scott received bonuses during the years he purportedly had an interest in the company disproves any alleged intent not to perform. On the contrary, the evidence before the jury was entirely consistent with the Mundheims intent not to perform on their promise that Scott would be an owner of the company. Before opening the company, Paul represented that he did not have any money. Paul accepted $50,000 in cash from Scott and promised Scott he would be a twenty-percent owner in the company. From the very beginning, Paul did not believe non-lawyers like Scott could have an actual ownership interest in the title company. The jury could have reasoned that Paul took Scott's $50,000 in cash, never reduced the agreement with Scott to writing so there would be no written contract, and the Mundheims paid Scott during the successful years the company operated to keep the company running smoothly. The jury could have believed Paul took the deal with Alamo and left Scott with nothing, and this established Paul never intended to make Scott an owner of the company.

Many of the same reasons support a finding that the Mundheims fraudulently induced Amy into an identical agreement in which Amy would own a forty-percent interest in the company. In addition to delivering the $50,000 from Scott, Amy also committed to full-time employment at the company in reliance on the Mundheims' representation that she would be a forty-percent owner. As with Scott, Paul did not believe Amy could actually have an ownership interest in the company. Additionally, in Amy's case, there was ultimately a written contract, the "settlement

agreement and mutual release." When asked why she decided to settle, Amy testified as follows:

> Paul and Paula Hester convinced me that Paul just wanted out of the business, and it was best to walk away, and they painted a story for me and -- and I believed them, and I fell back into a corner, thought I had no choice, and I settled.

Thus, the jury could have also reasoned that Amy was induced to enter into the October 2017 agreement by Paul's representations that he was quitting the title business. There was no evidence Paul disclosed his deal with Alamo or his intent to accept a bonus, salary, and fees in an ongoing position with Alamo and no evidence Amy signed the agreement to release her interest in the company so Paul could continue in the title business with Alamo free and clear.

The Mundheims argue there was insufficient evidence of reliance to support Amy's fraud claim because the agreement "expressly contemplates that [Amy] was giving up any claims to ownership" in the company, and she knew the company's worth and "what she was giving up." The jury could have reasonably concluded that Amy signed the agreement in reliance on Paul's representations that he was going to quit the title business and walk away from the company in which Amy had a forty-percent stake, but she would not have signed the agreement if she knew Paul was accepting a $400,000 bonus, a salary and monthly fees in return for allowing the company to be absorbed by Alamo.

Second, the Mundheims argue the terms of the agreement expressly state that Amy was not relying on any statements or omissions by the Mundheims in entering

–10–

the agreement. The agreement does provide that the parties waive and assume the risk of any claims for damages which they do not know or suspect to exist and which, if known, would materially affect the decision to enter the agreement. However, courts "must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding." *Int'l Bus. Machines*, 573 S.W.3d at 229 (quoting *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008)). A clause that clearly and unequivocally expresses the party's intent to disclaim reliance on the specific misrepresentations at issue can preclude a fraudulent-inducement claim. *Id.* at 229. This is not the case here. As discussed, the specific misrepresentations about which Amy complains, that Paul said he was walking away from the title business but was actually accepting a bonus and a well-paid position with Alamo, were not referenced in the agreement and were not disclosed to Amy. Thus, we reject the Mundheims' argument that the disclaimer-of-reliance provision in the agreement was binding to preclude Amy from asserting she relied on the Mundheims' misrepresentations when she entered the agreement. *See id.*

We conclude the evidence is legally and factually sufficient to establish the Mundheims fraudulently induced Scott and Amy into contracts for ownership of the company and fraudulently induced Amy to enter into the settlement agreement. *Fulgham*, 349 S.W.3d at 157; *Int'l Bus. Machines*, 573 S.W.3d at 228.

Fraud by nondisclosure is simply a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). To establish fraud by nondisclosure, a party must prove (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied).

In the context of fraud by nondisclosure, a duty to disclose may arise when the defendant: (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth. *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 220 (Tex. 2019).

The jury heard evidence that Paul accepted $50,000 in cash from Scott and promised Scott he would be a twenty-percent owner in the company. The jury could

–12–

have reasonably believed this representation created a false impression that imposed on the Mundheims the duty to disclose the whole truth: Scott could not actually be an owner of the company; his twenty-percent share would only be paid as long as it was expedient; and when Paul discovered Alamo was interested in taking over the company, he went ahead with the deal without telling Scott or paying him anything for his twenty-percent interest. *See Bombardier*, 572 S.W.3d at 220.

The Mundheims discovered Paul had an opportunity to profitably join Alamo and permit the dissolution of the company, and the Mundheims only partially disclosed to Amy Paul's dissolution of the company as "walking away." We conclude these circumstances imposed on the Mundheims the duty to disclose the whole truth to Amy. *See id.* We conclude the evidence is sufficient to support the jury's finding that the Mundheims defrauded Scott and Amy by nondisclosure. *Fulgham*, 349 S.W.3d at 157; *Blankinship*, 399 S.W.3d at 308.

The Mundheims challenge the sufficiency of the evidence to support the jury's findings the Mundheims and the Mundheim firm had actual awareness of the falsity of the representation or promise the jury found to be fraud. The Mundheims rely on *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53–54 (Tex. 1998) for the proposition that "[a]ctual awareness" does not mean merely that a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to

–13–

do it anyway." Once again, we have already determined the jury could have found that the Mundheims knew from the very beginning that they were misrepresenting the entire situation concerning Amy and Scott's involvement in the company. We conclude the evidence is legally and factually sufficient to support the jury's finding that the Mundheims had actual awareness of the falsity of their representations to Amy and Scott. *See Fulgham*, 349 S.W.3d at 157; *St. Paul Surplus Lines*, 974 S.W.2d at 53–54.

**Fraud Damages**

The Mundeims also attack the sufficiency of the evidence to support the jury's award of fraud damages to Scott and Amy. The jury has discretion to award damages within the range of evidence presented at trial. *SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 303 (Tex. App.—Dallas 2005). We are not permitted to disregard the jury's damages award on the basis that the jury's reasoning is unclear. *Id.* The jury awarded Scott $80,000, or twenty percent of the "bonus" Paul received from Alamo, and the jury awarded Amy $160,000. Both of these awards were in keeping with the twenty percent interest Scott had in the company and Amy's forty percent interest. The evidence is legally and factually sufficient to support the jury's award of damages for fraud. *See Fulgham*, 349 S.W.3d at 157; *SAS & Assocs.,* 168 S.W.3d at 303.

Under these circumstances, we conclude the evidence is legally and factually sufficient to support the jury's findings regarding the Mundheims' fraud, including

–14–

the Mundheims' misrepresentations, Scott's reliance on the Mundheims' misrepresentations, causation, and Scott's damages resulting from the Mundheims' fraud. *See Fulgham*, 349 S.W.3d at 157; *Zorrilla*, 469 S.W.3d at 153.

**Exemplary Damages**

Regarding the jury's award of exemplary damages to Scott and Amy, the Mundheims challenge the sufficiency of the evidence to prove by clear and convincing evidence the elements set forth in section 41.011 of the Texas Civil Practice and Remedies Code.

Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003. "Clear and convincing" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 645 (Tex. App. 2017)

The Mundheims challenge the jury's finding by clear and convincing evidence that the harm to Scott and Amy resulted from the Mundheims' fraud. Relying on their previous arguments, the Mundheims again contest the sufficiency of the evidence to show they made misrepresentations to Scott or Amy or intended not to perform the "alleged agreement." Our review of the record shows clear and convincing evidence that the harm Scott and Amy suffered resulted from the

Mundheims' fraud, including what the jury was free to conclude was a "sale" of the company to Alamo for $400,000.

We review an exemplary damage award under a factual sufficiency standard of review. *Hernandez v. Sovereign Cherokee Nation Tejas*, 343 S.W.3d 162, 168 (Tex. App.—Dallas 2011, pet. denied). We are not free to reweigh the evidence and set aside a jury verdict merely because we feel that a different result is more reasonable. *Id.* Because the award of exemplary damages rests in the jury's discretion, we will not set aside the damages unless after reviewing the entire record, we determine the award is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.*

When determining whether the exemplary damage award is excessive, we consider the following statutory factors: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of the Mundheims' culpability; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the Mundheims' net worth. *See* TEX.CIV. PRAC. & REM. CODE ANN. § 41.011(a); *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 913 (Tex. App.—Dallas 2014, pet. denied). The jury charge listed the 41.011 factors and instructed the jury to consider these factors in determining the amount of exemplary damages to assess for both Scott and Amy.

Here, the record supports the jury's findings that the Mundheims perpetrated a fraud on Scott and Amy as discussed above, and the Mundheims were actually aware of the fraud. Paul accepted $50,000 in cash from Scott to start up a business with Scott and Amy. After four years, Paul accepted a $400,000 "bonus" and went to work for Alamo earning $250,000 in fees and approximately $3000 per month in commissions. Not only did Scott and Amy receive nothing from Paul's deal with Alamo, Scott lost his twenty-percent income stream when the company ceased to exist as an entity in which he claimed an interest. Amy lost her forty-percent interest when the company ceased to exist. On this record, we conclude the clear and convincing evidence was legally and factually sufficient to support the jury's award of exemplary damages to Scott and Amy.

As to the jury's award of exemplary damages, the Mundheims further argue (1) the questions regarding fraud defined fraud as both actual and constructive fraud and therefore cannot support an award of exemplary damages and (2) the questions regarding the Mundheims actual awareness of the falsity of their representations omitted the requirement of "clear and convincing evidence." However, the Mundheims did not object to these alleged defects at trial. In fact, the Mundheims submitted a proposed jury charge that was identical with respect to the questions about which the Mundheims now complain. The Mundheims do not complain that the relevant issues were not submitted at all; they argue the issues were submitted defectively. A defendant must preserve error by objecting when an independent

–17–

theory of recovery is submitted defectively. *See* TEX. R. CIV. P. 279; *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 481 (Tex. 2017). This includes when an element of that theory of recovery is omitted. *Levine*, 537 S.W.3d at 481. Thus, the Mundehims' arguments about the defective nature of questions 6 and 8 present nothing for our review. *See id.* Having found the evidence sufficient to support the complained-of jury findings, we conclude the trial court did not err in denying the Mundheims' motion for judgment notwithstanding the verdict and motion for new trial. We overrule the Mundheims' issues complaining of the jury's fraud findings.

### Breach of Contract

In their next issue, the Mundheims argue Amy's breach of contract recovery should be set aside. Specifically, the Mundheims challenge the legal and factual sufficiency of the evidence to support the jury's findings that (1) they failed to comply with the agreement by failing to pay Amy all the monies due under the agreement and (2) the Mundheims owed Amy $151,000 under the agreement. The Mundheims argue the evidence established they were excused from performing under the agreement due to Amy's prior breach in violating the confidentiality provision by telling Scott about the agreement.

Amy responds that (1) Paul admitted not paying all monies owed pursuant to the agreement; (2) Paul stopped paying the money he owed under the agreement because it was his "belief" that Amy had disclosed to Scott information about the agreement in violation of the confidentiality provision; (3) Paul admitted he had only

–18–

his "belief" to rely on and did not have "any facts or evidence or anything like that" to show Amy violated the confidentiality provision; and (4) the Mundheims' "claims of first-breach by Amy were never pled and therefore could not properly form the basis for any judgment."

The record is clear that the Mundheims failed to pay Amy the final payment of $151,000 due under the agreement. Paul testified it was his "belief" that Amy had disclosed to Scott information about the agreement. Paul relied only on his "belief" and had no evidence Amy violated the confidentiality agreement. Marla testified, "I believe that [Amy] told Scott about [the agreement] right away." Marla identified no evidence to support her belief. Scott testified he did not know about the agreement until it was "put . . . into the case at some point." Amy testified, "Scott did not see the agreement." On this record, we conclude the evidence was legally and factually sufficient to support the jury's findings that the Mundheims failed to pay Amy $151,000 due under the agreement, and the Mundheims were not excused from performing under the agreement due to any violation of the confidentiality provision. *See Fulgham*, 349 S.W.3d at 157.

In an alternative argument, the Mundheims complain that the jury's award of $151,000 as Amy's damages from the Mundheims' breach of the agreement was excessive. The entirety of their argument is that the evidence established they "paid $223,112.00 of the Settlement Agreement's $301,000.00 owed, in payments of $100,000, $50,000, and payroll extending through the end of December 2017 of

–19–

$73,112 per the terms of the agreement." The agreement does provide for "regular payroll" payments from October through December 2017 totaling $73,112. However, a separate paragraph of the agreement entitled "Payment" provided for "lump sum or installment payments" amounting to "a grand total of ($301,000.00)." Thus, the express terms of the agreement show the $73,112 in regular payroll payments were separate from the $301,000. Because the jury's award of $151,000, coupled with the $150,000 the Mundheims paid Amy in lump sum payments merely resulted in the payment of the $301,000 contemplated by the settlement agreement, we conclude the award was not excessive. We overrule the Mundheims' issue regarding breach of contract.

## Election of Remedies for Amy

In their next issue, the Mundheims argue the trial court erred in failing to require Amy to elect her remedy. A party is entitled to sue and seek damages on alternative theories but is not entitled to recover on both theories; to do so is considered equivalent to a "double recovery." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998).

In this context, a double recovery exists when a plaintiff obtains more than one recovery for the same injury. *Waite Hill*, 959 S.W.2d at 184; *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991). The prohibition against double recovery is a corollary of the rule that a party is entitled to but one satisfaction for the injuries sustained by him. *See Stewart Title*, 822 S.W.2d at 7–8 (noting that

courts have applied the one satisfaction rule when defendants commit the same act as well as when defendants commit technically differing acts that result in a single injury). An election will normally be required between contract damages and fraud damages to prevent a double recovery. *Foley v. Parlier*, 68 S.W.3d 870, 883 (Tex. App.—Fort Worth 2002, no pet.).

Although the causes of action Amy asserted, breach of contract and fraud, were separate, the damages for both causes of action were the same: Amy's ownership interest in the company. In this situation, the Mundheims argue, Amy should be required to elect her remedy to recover either for breach of contract or fraud. We agree. Amy was entitled to sue and seek damages for both breach of contract and fraud, but she is not entitled to recover on both theories. *Waite Hill*, 959 S.W.2d at 184.

Further, to the extent Amy seeks recovery for fraudulent inducement associated with the agreement and also seeks recovery for breach of the agreement, these remedies are inconsistent. A plaintiff who has two inconsistent remedies must elect between them and pursue only one of them. *Foley*, 68 S.W.3d at 882. Remedies are inconsistent when one of the remedies results from affirming the transaction and the other results from disaffirming the transaction. *Id.* For example, in a fraud case, the plaintiff can either claim rescission for fraud and get his property back or he can sue for damages and affirm the transaction. *Id.* In *Dallas Farm*

*Machinery Co. v. Reaves*, specifically regarding remedies for fraudulent inducement and breach of contract damages, the supreme court stated:

> [I]t is well settled that one who is induced by fraud to enter into a contract has his choice of remedies. He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought and receive back what he paid.

158 Tex. 1, 307 S.W.2d 233, 238–39 (1957); *see also Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 677 (Tex. 2000) (recognizing quote from *Reaves* as correct statement of long-standing general proposition of law).

Thus, in electing a remedy, Amy has two choices. She can elect to recover for breach of contract and recover the amount owed under the contract, or she can elect to recover for fraud and return the $150,000 the Mundheims paid to her pursuant to the contract. *See Foley*, 68 S.W.3d at 883.

We note that the agreement expressly provided a waiver of claims that included "any claims for any alleged fraud." Thus, not only is Amy required to elect her remedies to prevent a double recovery and to elect between inconsistent remedies, if she elects to recover for breach of contract, the express terms of the agreement bar recovery of any damages for fraud. *See id.* We sustain the Mundheim's issue regarding election of remedies.

### Attorney's Fees

In their next issue, the Mundheims argue the trial court erred in awarding Amy attorney's fees. First, the Mundheims point out that the settlement agreement provides that each party will bear its own "attorney's fees incurred in connection

with any future Litigation or Attorney review of this document."  The Civil Practice and Remedies Code provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . .an oral or written contract."  TEX. CIV. PRAC & REM. CODE ANN. § 38.001; *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 60 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).  To obtain an award of attorney's fees under Section 38.001, "a party must (1) prevail on a cause of action for which attorneys fees are recoverable, and (2) recover damages."  *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).  However, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's."  *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009).  When parties include such a provision in a contract, the language of the contract controls, rather than the language of the statute.  *Id.* at 654–56.  We agree the settlement agreement controls and precludes Amy's recovery of attorney's fees if she elects her remedy for breach of contract.  *See id.*  Second, the Mundheims assert attorney's fees are not recoverable for fraud.  *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).  Again, we agree.  *See id.*  Thus, Amy is not entitled to recover attorney's fees if she elects her remedy for fraud; because Scott's claim is for fraud, he is also not entitled to attorney's fees.  *See id.*  We sustain the Mundheims' issue regarding attorney's fees.

Accordingly, we (i) reverse the trial court's award of attorney's fees and render judgment that Amy and Scott take nothing on their claims for attorney's fees and (ii) remand for Amy to elect her remedy in accordance with this opinion. In all other respects, we affirm the trial court's judgment.

/Craig Smith/
CRAIG SMITH
JUSTICE

191490F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

PAUL MUNDHEIM, MARLA
MUNDHEIM, AND THE
MUNDHEIM FIRM, PLLC,
Appellants

No. 05-19-01490-CV V.

SCOTT LEPP AND AMY TORRES
LEPP, Appellees

On Appeal from the County Court at
Law No. 4, Dallas County, Texas
Trial Court Cause No. CC-18-01169-
D.
Opinion delivered by Justice Smith.
Justices Molberg and Goldstein
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding Scott Lepp and Amy Torres Lepp attorney's fees and **RENDER** judgment that Scott Lepp and Amy Torres Lepp take nothing on their claims for attorney's fees. We **REMAND** this cause to the trial court for Amy Torres Lepp to elect her remedy in accordance with this Court's opinion. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 13th day of May 2021.